Slip. Op. 18-14

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| UNITED STATES,<br><br> Plaintiff,<br><br> v.<br><br>UNIVAR USA INC.,<br><br> Defendant. | Before: Mark A. Barnett, Judge<br><br>Court No. 15-00215 |

## <u>MEMORANDUM AND ORDER</u>

Pending before the court are three motions *in limine*.  Two of the motions were filed by Defendant Univar USA Inc. ("Defendant" or "Univar"), both of which the United States ("Plaintiff" or "the Government") opposes.  Def. Univar USA Inc.'s Mot. *in Limine* No. 1 (Tables Provided by Taiwan Customs) ("Def.'s First Mot. *in Limine*"), ECF No. 142; Def. Univar USA Inc.'s Motion *in Limine* No. 2 (Dr. Henry McFarland) ("Def.'s Second Mot. *in Limine*"), ECF No. 163; Pl.'s Resp. to Def.'s Mot. *in Limine* to Exclude Taiwan's Records Showing Transshipment from China through Taiwan to the United States ("Pl.'s Resp. to Def.'s First Mot. *in Limine*"), ECF No. 150; Pl.'s Resp. to Def.'s Mot. *in Limine* to Exclude Henry McFarland, Ph.D. from Testifying as an Expert Economist ("Pl.'s Resp. to Def.'s Second Mot. *in Limine*"), ECF No. 167.  The third motion *in limine* was filed by the Government, to which Univar has filed a response in opposition.  The United States' Mot. *in Limine* to Preclude a Lawyer from Testifying Regarding his Legal Interpretation of "Reasonable Care," and Applying his Interpretation

of the Facts of this Case ("Pl.'s Mot. *in Limine*"), ECF No. 152;  Univar USA Inc.'s Resp.

to Gov't's Mot. *in Limine* Concerning Michael O'Rourke ("Def.'s Resp."), ECF No. 159.

The court heard oral argument on these motions on December 19, 2017.  Hr'g Tr., ECF

No. 173.[1]  For the reasons that follow, the court denies Defendant's first motion *in*

*limine*, grants, in part, Defendant's second motion *in limine*, and grants the

Government's motion *in limine*.

## I.    Background

The Government filed this action against Univar seeking to recover unpaid

antidumping duties and a monetary penalty pursuant to 19 U.S.C. § 1592, stemming

from 36 entries of saccharin, allegedly transshipped from the People's Republic of

China ("China" or the "PRC") through the Republic of China (Taiwan) ("Taiwan"), and

entered into the commerce of the United States between 2007 and 2012.  Compl. ¶ 1,

ECF No. 2.  The Government alleges that Univar's actions were grossly negligent or

negligent when it misrepresented the country of origin of the subject saccharin on U.S.

Customs and Border Patrol ("CBP") entry documents as Taiwan when, in fact, the

saccharin originated from China.  *Id.* ¶¶ 28, 32.  The Government seeks recovery of

$36,088,718.03 in unpaid antidumping duties pursuant to 19 U.S.C. § 1592(d), and a

---

[1] Following the hearing, Defendant's counsel filed a letter titled "Factual Correction of
Argument Made by Counsel for Government at December 19, 2017 Oral Argument."
Letter from Lucius B. Lau, counsel for Defendant, White & Case, LLP to the court (Dec.
21, 2017), ECF No. 171.  The Government filed a response asking the court to "reject
the supplemental brief because Univar did not seek the Court's leave to file it."  Pl.'s
Resp. to Def.'s Letter Mot. for Leave to File a Suppl. Br. in Support of its Motion *in*
*Limine* to Exclude Taiwan's Records Showing Transshipment of Saccharin From China
Through Taiwan to The United States ("Pl.'s Suppl. Br.") at 1, ECF No. ECF No. 172.
The Government's response, however, also contains a supplemental brief.  *Id.* at 2-3.
Although the court does not condone supplemental filings without the court's consent, it
has considered both for purposes of these motions.

civil penalty in the amount of $47,888,851.00 pursuant to 19 U.S.C. § 1592(c)(3). *Id.* ¶¶

33-34.  Discovery has closed and Univar has filed a motion for summary judgment.  See

Order (Nov. 25, 2015), ECF No. 16, *as amended by* Memorandum and Order (July 3,

2017), ECF No. 134, *as amended by* Memorandum and Order (Aug. 29, 2017), ECF

No. 151; Univar's Mot. for Summ. J., ECF No. 143.  The court will address the summary

judgment motion after ruling on the motions *in limine*.

Univar, in its first motion *in limine*, seeks to exclude certain import and export

data provided to the United States by Taiwan's Department of Investigation, Customs

Administration, Ministry of Finance ("Taiwan Customs") that the Government has

characterized as the "wedge pin fact" that shows the saccharin in question originated

from China.  Def.'s First Mot. *in Limine* at 1; *id.* Ex. 12 (Deposition of Patrick Deas) at

119:1-12, 120:13-25.  The Government seeks to admit this data under exceptions to the

rule against hearsay or, alternatively, through its proposed expert witness, Dr. Henry

McFarland.  *See generally* Pl.'s Resp. to Def.'s First Mot. in Limine.  Univar challenges

the admissibility of this data under any of the hearsay exceptions and through Dr.

McFarland's testimony.  Def.'s First Mot. *in Limine* at 18-22; Hr'g Tr. at 15-17, 19-29.

Moreover, in its second motion *in limine*, Univar seeks to exclude Dr. McFarland from

testifying altogether, on the bases that his testimony is neither helpful nor reliable.

Def.'s Second Mot. *in Limine* at 2 (citing Fed. R. Evid. 702(a),(c)).

The monetary penalty in this matter is based on the alternatively alleged

culpability of negligence; therefore, the Government bears the initial burden of proving

the act or omission constituting the violation; the burden then shifts to Univar to

"affirmatively demonstrate that it exercised reasonable care under the circumstances."

*United States v. Ford Motor Co.*, 463 F.3d 1267, 1279 (Fed. Cir. 2006) (citing 19 U.S.C. § 1592(e)(4)).  In that vein, Univar has offered an expert witness, attorney Michael O'Rourke, Esq., to provide his opinion on the standard of "reasonable care" within the confines of 19 U.S.C. § 1592 and whether Univar "acted reasonably in its efforts to determine the country of origin of the saccharin it imported."  *See* Pl.'s Mot. *in Limine*, Ex. 1 (Expert Report of Michael S. O' Rourke) ("O'Rourke Report"), ECF No. 152-1. The Government seeks to exclude Mr. O'Rourke from testifying on the grounds that his testimony impermissibly draws legal conclusions and usurps the functions of both the judge and jury, both contentions with which Univar disagrees.  *See generally* Pl.'s Mot. *in Limine*; Def.'s Resp. to Pl.'s Mot. *in Limine.*

## II.    Discussion

A decision on these evidentiary matters lies within the sound discretion of the court.  *N. Am. Processing Co. v. United States*, 22 CIT 701, 703, 15 F. Supp. 2d 934, 936 (1998).  "Generally speaking, *in limine* rulings are preliminary in character because they determine the admissibility of evidence before the context of trial has actually been developed."  *Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.,* 479 F.3d 1330, 1338 (Fed. Cir. 2007).  All relevant evidence is admissible unless the U.S. Constitution, a federal statute, the rules of evidence, or other rules prescribed by the Supreme Court provide otherwise.  Fed. R. Evid. 402; *see also* 28 U.S.C. § 2641 (stating that the Federal Rules of Evidence apply to all civil actions in the U.S. Court of International Trade ("CIT"), with certain exceptions not relevant here).  Relevant evidence is that which "has any tendency to make a fact more or less probable than it would be without the evidence; and . . . the fact is of consequence in determining the

action."  Fed. R. Evid. 401.  Against that general backdrop, the court turns to the

specific issues raised in each motion *in limine*.

### a. Defendant's First Motion *in Limine* is Denied

Univar seeks to exclude certain import and export data that Taiwan Customs

provided to the United States.  Def.'s First Mot. *in Limine* at 1.  The data is in the form of

three distinct spreadsheets.  Def.'s First Mot. *in Limine*, Ex. 1 (spreadsheets provided by

Taiwan customs on January 13, 2017), ECF No. 142-1; *see also* Pl.'s Resp. to Def.'s

First Mot. *in Limine*, Ex. 1 (spreadsheets provided by Taiwan Customs on August 1,

2017) ("Taiwan Customs Tables"), ECF No. 150-1.[2]  One table purports to show 20

shipments of saccharin imported into Taiwan from China by Long Hwang Chemical Co.

("LH Chemical") from 2009 to 2011.  *See* Taiwan Customs Tables.  A second table

purports to show 16 shipments of saccharin exported from Taiwan to the United States

by Lung Huang Trading Co., Ltd. ("LH Trading") from 2009 to 2012.[3]  Taiwan Customs

Tables.  A third table purports to show Taiwan's annual statistics relating to the country

of origin of its saccharin imports from 2007 to 2012.  Taiwan Customs Tables. The

Government proffers that it intends to introduce the Taiwan Customs Tables to "show

---

[2] In its motion, Univar seeks to exclude the January 13, 2017 spreadsheets, "or any
other versions" of the spreadsheets.  Def.'s First Mot. *in Limine* at 1.  Since the filing of
Univar's motion, the Government obtained the August 1, 2017 version of the
spreadsheets, which version includes additional categories of information.  *See* Taiwan
Customs Tables.  Because the Government has provided updated spreadsheets, the
court considers Univar's request as addressing the January 13, 2017 spreadsheets as
amended by the August 1, 2017 spreadsheets.  For ease of reference, the court will
refer to the August 1, 2017 version of the spreadsheets collectively as "Taiwan Customs
Tables," or, simply, "the tables."
[3] The Government contends that the two companies are the same.  *See* Confidential
Pl.'s Rule 56.3 Counterstatement of Fact ¶ 186, ECF No. 154-1.  Univar disputes this
contention.  Univar USA Inc.'s Rebuttal to Pl.'s Rule 56.3 Counterstatement ¶ 186, ECF
No. 161-1.

that the amount of saccharin imported into Taiwan from China by Univar's supplier was nearly identical to, and contemporaneous with, the amount of saccharin exported to Univar." Pl.'s Resp. to Def.'s First Mot. *in Limine* at 1.

Univar argues that the court should exclude the tables because they are inadmissible hearsay pursuant to Rule 801(c) of the Federal Rules of Evidence. Def.'s First Mot. *in Limine* at 2. Alternatively, Univar argues that the tables are not original data, thereby violating rule Rule 1002, and are inadmissible summaries that must be excluded because the Government has not complied with Rule 1006. *Id*. Lastly, Univar asserts that even if all the evidentiary requirements have been met, the court should exclude the tables because they are unfairly prejudicial and will mislead the jury. *Id*. at 2.[4]

The Government does not dispute that the tables are hearsay. *See, e.g.*, Pl.'s Resp. to Def.'s First Mot. *in Limine* at 5 ("Taiwan's records are admissible hearsay.") (capitalization omitted). Instead, the Government counters that the Taiwan Customs Tables are admissible pursuant to Rules 803(8) and 803(6) of the Federal Rules of Evidence. *Id.* at 7-12. Additionally, the Government argues that it may introduce the tables through its expert witness, Dr. Henry McFarland, pursuant to Rule 703. *Id*. at 12-14. Lastly, the Government challenges Defendant's assertions that the tables do not satisfy the best evidence rule, are inadmissible summaries, and would lead to unfair prejudice and mislead the jury. *Id*. at 14-19.

---

[4] Univar does not argue that the tables are irrelevant. Indeed, the tables are relevant because the import and export information that the tables contain would tend to make the alleged transshipment of saccharin more probable than it would be without this evidence. Fed. R. Evid. 401.

Hearsay is an out of court statement offered "to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  Hearsay is inadmissible at trial unless a federal statute, Federal Rule of Evidence, or other rule prescribed by the Supreme Court provides otherwise.  Fed. R. Evid. 802.  Rule 803 of the Federal Rules of Evidence establishes certain exceptions to the hearsay rule, regardless of whether a declarant is available to testify.  Fed. R. Evid. 803.  Pursuant to 803(8), "[a] record[5] or statement of a public office" that "sets out . . . a matter observed while under a legal duty to report" is not excluded as hearsay, provided "the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8)(A)(ii), (B).  This exception applies to records or statements of foreign public offices.  *See F.A.A. v. Landy*, 705 F.2d 624, 633 (2d Cir. 1983); *United States v. Regner*, 677 F.2d 754, 762 (9th Cir. 1982).  Justification for this exception lies in "the assumption that a public official will perform his duty properly and the unlikelihood that he will remember details independently of the record."  Fed. R. Evid. 803(8) advisory committee's note to the 1972 proposed rules.  "The relevant inquiry under Rule 803(8) is whether the information was recorded by a public official as part of a routine procedure in a non-adversarial setting."  *United States v. Puente*, 826 F.2d 1415, 1418 (5th Cir. 1987) (emphasis omitted).

If the proponent establishes the facial requirements of Rule 803(8), the burden shifts to the opponent to show that the tables lack the requisite indicia of reliability.  *See* Fed. R. Evid. 803(8) advisory committee's note to the 2014 amendment.  In so doing,

---

[5] A "'record' includes a memorandum, report, or data compilation."  Fed. R. Evid. 101(b)(4).

the opponent "is not necessarily required to introduce affirmative evidence of

untrustworthiness"; the court's determination of untrustworthiness "necessarily depends

on the circumstances."  *Id.* (stating, "[f]or example, the opponent might argue that a

record was prepared in anticipation of litigation and is favorable to the preparing party

without needing to introduce evidence on the point.").  In other contexts, the U.S. Court

of Appeals for the Federal Circuit ("CAFC") has recognized a presumption that

government officials carry out their duties in good faith; "[u]nsubstantiated suspicions

and allegations [to overcome that presumption] are not enough." *Spezzaferro v. F.A.A.*,

807 F.2d 169, 173 (Fed. Cir. 1986).  Rather, the proof to overcome that presumption

"must be almost 'irrefragable.'" *Id.* (citations omitted).  This presumption is no less

applicable because the government officials involved here are with the Taiwanese

government.  *See, e.g.*, *State of Israel v. Motor Vessel Nili*, 318 F. Supp. 1196, 1200 &

n.17 (S.D. Fla. 1968), *aff'd*, 435 F.2d 242 (5th Cir. 1970) (citing, *inter alia*, *United States*

*v. King*, 44 U.S. 773, 785-786 (1845)) (recognizing a presumption that foreign officials

properly discharge their official duties).

The court finds that the tables meet the facial requirements of Rule 803(8)(A)(ii).

The tables are accompanied by an affidavit and two letters from Shih-Feng Chen, the

Director of Taiwan Customs Administration, Department of Investigation.  *See* Aff. of

Shih-Feng Chen; Letter from Shih-Feng Chen, Director, Department of Investigation,

Taiwan Customs Administration, to Michael Pignatello, Acting Chief, Economic Section,

American Institute in Taiwan (August 1, 2017); and Letter from Shih-Feng Chen to

Christopher Q. Pater, Attaché for Hong Kong, Macau, and Taiwan, Department of

Homeland Security, Immigration and Customs Enforcement (August 1, 2017),

accompanying the Taiwan Customs Tables ("Chen Aff. & Letters"), ECF No. 150-1.  Mr.

Chen states that "[t]he data provided are within the offices [sic] lawful activities," and

that "[t]he tables show those two companies' import and export records, retrieved from

our database from 2009 to 2012, under tariff classification 29251100."  *Id*.  Mr. Chen

further explains that the database "keeps all electronic declaration[s] and relevant files

for five years following the data [sic] on which the cargoes concerned are released, and

those files may be destroyed after this period has passed."  *Id*.  Mr. Chen's explanation

that the tables were "retrieved from [the Taiwan Customs] database" pertaining to the

period of 2009 to 2012 and "under tariff classification 29251100" and that the database

keeps "relevant files for five years," after which they "may be destroyed," shows that the

electronic database was created as part of a routine procedure as shipments were

imported and exported from Taiwan and the information and statistics were collected.

Therefore, the tables meet the facial requirements of the public records exception.  *See*

Fed. R. Evid. 803(8)(A)(ii); 101(b)(4).

Defendant's challenge to admission of the tables pursuant to Rule 803(8) rests

on the trustworthiness of the tables.  Def.'s First Mot. *in Limine* at 19 ("These tables,

however, do not meet the standard set forth in Rule 803(8). Specifically, the tables

suffer from a 'lack of trustworthiness.'").  Defendant argues that the tables are

"untrustworthy because the manner in which they were created is unknown."  *Id*. at 21-

22.  Defendant posits that "[a]lthough Taiwan Customs requires extensive information"

before merchandise can be imported into and exported from that country, the tables

"only provide a fraction of the information" that should be in Taiwan Customs'

possession.  *Id*. at 14.  Defendant avers that documents required for shipments to and

from Taiwan include a commercial invoice, bill of lading or air waybill, and customs

import and export declarations. *Id.* at 11 (citing *id.*, Exs. 26-27 (sample declaration

forms)). Combined, these documents yield 54 separate types of information for imports

and 48 separate types of information for exports. *Id*. at 22. Yet, a comparison of the

types of information from these documents and the tables shows that the tables reflect

only select information.[6] *Id.* at 22. Accordingly, Defendant asserts that the tables "are

not an accurate printout of the Taiwan Customs database from which the summarized

tables apparently derived." *Id.* at 1. Univar's complaints that the tables are allegedly

incomplete go to the weight, not the admissibility, of the tables. *See Moss v. Ole S.*

*Real Estate, Inc.*, 933 F.2d 1300, 1307 (5th Cir. 1991). "In making the trustworthiness

determination required by Rule 803[(8)], courts should not focus on questions regarding

the accuracy or completeness of the document's conclusions." *Id*. The court, therefore,

does not find the lack of additional categories of information renders the tables

untrustworthy.

---

[6] For instance, Univar asserts that the import table reflects only 13 out of the 54 types of information Taiwan Customs would typically collect and the export table reflects only 14 out of the 48 types of information. Def.'s First Mot. *in Limine* at 22. By way of example, the August 1, 2017, import table includes, for each shipment record of LH Chemical, the date of import declaration, the import declaration number, the country of origin, the shipping vessel and voyage number, the buyer, the seller of the saccharin, the commodity description, the quantity, units, and weight of each shipment, the port of departure, the port of entry, and the entered value of each shipment. Taiwan Customs Tables. Defendant lists examples of information typically collected by Taiwan Customs, but not included in the tables, including type of declaration, vessel registration number, date of exportation, date of importation, and so forth. Def.'s First Mot. *in Limine* at 15-17.

Next, citing *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 167 n.11 (1988),[7] Univar argues that Taiwan Customs is biased because it cooperated with the U.S. Government over the span of several years with respect to producing the tables and whatever information the Government requested, but refused to produce a witness for deposition when Univar requested one.  Def.'s First Mot. *in Limine* at 19-21.  Univar cites *In re Vitamin C Antitrust Litig.*, No. 05-CV-0453, 2012 WL 4511308 (E.D.N.Y. Oct. 1, 2012) as analogous to this case.  In short, it classifies the tables as "litigation-created documents designed to aid the government in its case against Univar."  Def.'s First. Mot. *in Limine* at 22.  At oral argument, it similarly argued that the tables were not created for Taiwan's own use, but to help the Government.  Hr'g Tr. at 27.

*In re Vitamin C Antitrust Litig.*, 2012 WL 4511308 is not analogous to this case. In that case, the Ministry of Commerce of the PRC submitted several written statements to the court in the nature of *amicus* submissions.  2012 WL 4511308, at *1.  The court found that the Ministry shared a common interest with the defendants in seeking a dismissal of the lawsuit; in light of that common interest, the Ministry had an agreement with the defendants to "share litigation related information with each other"; the Ministry and defendants worked in "close coordination" in defending the lawsuit; and the Ministry was actively involved in coordinating and approving the defendants' legal strategy.  *Id*. at *3.  Moreover, the same law firm that represented the Ministry as an *amicus* had provided legal advice to the defendants.  *Id*.  The court also had previously determined that one of the Ministry's statements read more like a "carefully crafted and phrased

---

[7] In the context of public investigatory reports, which fall under Rule 803(8)(A)(iii), "possible bias when reports are prepared with a view to possible litigation" is a factor to consider in the trustworthiness inquiry.  *Beech*, 488 U.S. at 167 n.11.

litigation position." *Id*.  In light of those circumstances, the court found the *amicus*

submissions untrustworthy and, therefore, not covered by the hearsay exception

provided in Rule 803(8).  *Id*. at *4.  None of these circumstances exist here.

In January 2001, the United States executed a customs mutual assistance

agreement with Taiwan that was aimed at ensuring cooperation among the signatories

in "matters related to the administration and enforcement of the customs laws of their

respective customs territories."  *See* Def's First Mot. *in Limine*, Ex. 5 (Agreement

Between the American Institute in Taiwan and the Taipei Economic and Cultural

Representative Office in the United States Regarding Mutual Assistance Between their

Designated Representatives, the United States Customs Administration and the Taiwan

Customs Administration) ("US – Taiwan CMAA") at US008607, ECF 142-4.  The

signatories agreed that "[u]pon request, a Customs Administration shall provide

assistance in the form of information necessary to ensure the enforcement of the

customs laws and accurate assessment of customs duties and other taxes by the

[other] Customs Administration."  *Id*., Art. 3 ¶ 1.  Mr. Chen's letter explains that the

tables were provided pursuant to the US-Taiwan CMAA after the Government

requested that information.  Chen Aff. & Letters .  That Taiwan responded to the

Government's requests to provide the tables pursuant to the US-Taiwan CMAA does

not suggest any bias on the part of Taiwan Customs.  Likewise, that the previous

version of the tables contained fewer categories of information does not suggest bias by

Taiwan Customs.  Instead, these facts merely show that Taiwan sought to be

responsive to the Government's requests in the spirit of cooperation reflected in the US-

Taiwan CMAA.  Therefore, as the party opposing the introduction of these tables,

Univar has failed to point to negative factors sufficient to cause the court to conclude

that the tables are untrustworthy, and the court has no reason to believe that they are

untrustworthy so as to preclude their admission under Rule 803(8)(A)(ii).

Defendant's next challenge to the tables' admissibility is premised on Rule 1002,

which states that "[a]n original writing, recording, or photograph is required in order to

prove its content unless these rules or a federal statute provides otherwise."  Fed. R.

Evid. 1002; *see also* Def.'s First Mot. *in Limine* at 23-24.  "For electronically stored

information, 'original' means any printout--or other output readable by sight--if it

accurately reflects the information."  Fed. R. Evid. 1001(d).  Defendant states that the

export table does not accurately reflect the information contained in Taiwan Customs'

database because the commodity description column is missing the "mesh size"

information and other data, which the Government had produced on a previous

occasion.  Def.'s First Mot. *in Limine* at 23; Hr'g Tr. at 30.  Although the court is not

persuaded by this argument, a recent filing by the Government indicates that the

Government has since provided Univar with an electronic version of the tables with

access to the full contents of each data field, including the "mesh size" in the commodity

description column, so that this particular issue is moot.  *See* Pl.'s Suppl. Br., Ex. A (E-

mail from Stephen Tosini, Senior Trial Counsel, U.S. Department of Justice, Civil

Division, Commercial Litigation Branch, to Sadie Gardner and Lucius B. Lau, counsel

for Defendant, White & Case, LLP (Dec. 22, 2017 9:39:00)), ECF No. 172-1.

Otherwise, the court agrees with the Government that Taiwan's production of the tables

"with different categories of information at different times does not render either set of

information 'inaccurate.'"  *See* Pl.'s Resp. to Def.'s First Mot. *in Limine* at 15.

Univar next argues that the tables are inadmissible under Rule 1006 because they are "summaries of 'electronic declarations' and 'relevant files' that largely have not been provided in discovery." Def.'s First Mot. *in Limine* at 25. Having concluded that the tables are public records, within the meaning of Rule 803(8)(A)(ii), the court finds that the tables do not fit within the ambit of Rule 1006. Rule 1006 permits the use of "a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court," provided that the "proponent [] make[s] the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." Fed. R. Evid. 1006. Based on Mr. Chen's letters and affidavit, the records list "20 shipments imported from China by [LH Chemical] and 16 shipments exported to the U.S.A. by [LH Trading]." Chen Aff. & Letters. Mr. Chen's letters and affidavit do not indicate that Taiwan Customs' tables were created as a summary of "voluminous writings, recordings, or photographs that cannot be conveniently examined in court." *See* Fed. R. Evid. 1006. Therefore, Rule 1006 is inapplicable here. Similarly, the court finds *Conoco Inc. v. Dep't of Energy*, 99 F.3d 387 (Fed. Cir. 1996), *as amended on reh'g in part* (Jan. 2, 1997), on which Plaintiff relies, inapposite for it concerned the admission of "purchase schedules," which consisted of actual summaries prepared, long after the events, by three oil companies, for which the underlying documentation had not been provided and that the district court admitted under the residual hearsay exception of then-Rule 803(24).[8]  *See* 99 F.3d at 392; Def.'s First Mot. *in Limine* at 25-26, 27.

---

[8] In 1997, the contents of Rule 803(24) and 804(b)(5) were combined and transferred to Rule 807.  Fed. R. Evid. 807 advisory committee's note to 1997 amendment.

Univar's related argument that the tables must be excluded because they contain hearsay provided to Taiwan Customs from private parties is also unpersuasive.  Hr'g Tr. at 5, 18-19 (citing, *inter alia*, Fed. R. Evid. 805); *see also* Def.'s First Mot. in Limine at 26-27 (arguing that the documents that underlie the Taiwan Customs Tables must themselves be admissible).  Univar relies on *United States v. Doyle*, 130 F.3d 523 (2nd Cir. 1997) to support its proposition that a separate showing of admissibility must be made for the underlying documents and relevant files from which the tables were created.  *Id*. at 25.  But *Doyle* is distinguishable from the instant case.  In *Doyle*, the Second Circuit questioned the district court's decision to admit "documents collected by, but not generated by, the government of Malta," 130 F.3d at 544, because there was no showing that the documents were reliable, *id*. at 546. [9]  The disputed documents were filed with the Customs Department of Malta "by private companies, including shipping agencies."  *Id*.  Unlike in *Doyle*, the evidence at issue concerns tables generated by Taiwan Customs.  Mr. Chen's affidavit and letters explain that the information provided was retrieved from the Taiwan Customs database that was created and maintained under Tawian Customs' legal obligation to process and track imports and exports.  *See* Chen Aff. & Letters.  That some information used to populate that database may have come from third parties does not persuade the court that the tables are inadmissible. *See, e.g.*, *Moss*, 933 F.2d at 1309-10 ("[M]any government reports, as with many expert

---

[9] The court found that the admission of the disputed records "would in all probability be an abuse of the discretion by the trial court," but stopped short of holding that it was. 130 F.3d at 546.  Because the court was remanding the case on other issues, it called the issue to the district court's attention.  *Id*.

witnesses, have to rely in part on hearsay evidence, and the reports are not generally
excluded for this reason.").

        Moreover, contrary to Univar's averment, the court finds that the tables are highly
probative, and their probative value is not substantially outweighed by unfair prejudice
or potential to mislead the jury.  *See* Fed. R. Evid. 403; Def.'s First Mot. *in Limine* at 28-
31.  Evidence is prejudicial if it "involves some adverse effect . . . beyond tending to
prove the fact or issue that justified its admission into evidence." *Highland Capital
Mgmt., L.P. v. Schneider,* 551 F. Supp. 2d 173, 176–77 (S.D.N.Y. 2008) (quoting *United
States v. Gelzer,* 50 F.3d 1133, 1139 (2d Cir. 1995)).  Unfair prejudice would invite "an
undue tendency to suggest decision on an improper basis, commonly, though not
necessarily, an emotional one."  Fed. R. Evid. 403 advisory committee's note on 1972
proposed rules.

        Univar argues that a decision to admit the tables will result in unfair prejudice to
Univar because it did not have the opportunity to depose or cross-examine a Taiwan
Customs official regarding the tables.  Def.'s First Mot. *in Limine* at 30.  Univar contends
that the tables will mislead the jury "because there is a danger that the jury will interpret
the imports on the tables as 'matching' the exports only because of the selective nature
of the tables."  Def.'s First Mot. *in Limine* at 28.  Univar complains of the following "key"
information that is missing from the tables that, if disclosed, could discredit the
government's theory: date of importation; date of exportation; unit price; net weight;
exchange rate; description of packaging; and the total number of packages per unit.
Def.'s First Mot. *in Limine* at 29.  The court finds that to the extent that the absence of
any of this information has the potential to mislead the jury, Univar should be able to

alert the jury to the perceived flaws in the tables and advocate its theory of the case.

Moreover, that Univar did not have the opportunity to depose or cross-examine a

Taiwan Customs official does not substantially outweigh the tables' probative value.

Any challenges that Univar has which relate to the weight of the tables can be

addressed in its case in chief or closing arguments but are not grounds to exclude the

tables from the jury's consideration.

Because the court finds that the Taiwan Customs Tables are admissible as

public records pursuant to Rule 803(8), it need not discuss whether the tables are

admissible under Rule 803(6) or Rule 703.  Accordingly, for the foregoing reasons,

Univar's first motion *in limine* is denied.

### b.  Defendant's Second Motion *in Limine* is Granted in Part

Defendant seeks to preclude Dr. Henry B. McFarland, the Government's

proposed expert witness, an economist, from testifying at trial.  Def.'s Second Mot. *in*

*Limine* at 1.  Dr. McFarland issued an expert report, a rebuttal report, and a

supplemental report in this case.  Def.'s Second Mot. *in Limine*, Exs. 1 (Expert Report of

Henry B. McFarland, Ph.D, March 29, 2017) ("McFarland Report"), 2 (Rebuttal Report of

Henry B. McFarland, Ph.D., May 8, 2017) ("McFarland Rebuttal Report"), 3 (Suppl.

Report of Henry B. McFarland, Ph.D., Jul. 25, 2017) ("McFarland Suppl. Report."), ECF

Nos. 163-2, 163-3, 163-4.  In his expert report, Dr. McFarland opined that "[t]he

saccharin imports whose country of origin is in question were much more likely to have

been brought into Taiwan from China than to have been brought in from a third country

or produced in Taiwan," and "the saccharin in question likely was in fact produced in

China."  McFarland Report at 2.  In his rebuttal report, Dr. McFarland offers the following

additional opinions:  (1) "While Taiwan may have underground (or shadow) economic activity, there is no evidence that sector includes a saccharin manufacturing plant that could have supplied the saccharin imports at issue in this litigation"; (2) based on the description of Professor Jane K. Winn, Defendant's rebuttal expert witness, "of changes in Taiwan's economy[, ] it seem[s] less likely that saccharin was manufactured in the shadow economy"; and (3) "William Huang and the companies with which he is associated may have operated as trading companies in Taiwan's shadow economy, but there is no evidence they manufactured saccharin in Taiwan."  McFarland Rebuttal Report at 1-2.  In his supplemental report, Dr. McFarland offers the following opinions: "[LH Chemical's] saccharin imports almost all went through the Taiwanese port of Kaohsiung, the same port used by all of [LH Trading's] saccharin exports"; and "[d]ata on the value of imports and exports indicate that importing this material from China and then exporting it to the United States would have been profitable for the Huang companies."  McFarland Suppl. Report at 1-2.  Defendant's motion seeking to exclude Dr. McFarland's opinions rests on two primary challenges; first, that Dr. McFarland does not possess "specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue"; second, that Dr. McFarland's testimony is not based on "reliable methods and principles."  Def.'s Second Mot. *in Limine* at 2 (citing Fed. R. Evid. 702(a),(c)), 14-25.

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony.  As relevant here, a witness must be "qualified as an expert by knowledge, skill, experience, training, or education," and his testimony must be "the product of reliable principles and methods."  Fed. R. Evid. 702; *see also Carnegie Mellon Univ. v.*

*Marvell Tech. Grp., Ltd.*, 807 F.3d 1283, 1302-03 (Fed. Cir. 2015).  Trial judges are

charged with the responsibility of acting as gatekeepers to ensure that expert testimony

is both relevant and reliable.  *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.

579, 589, 597 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999)

(extending the trial court's "basic gatekeeping obligation" to all expert testimony).

"Whether a witness is qualified" as an expert "can only be determined by the nature of

the opinion he offers," *Gladhill v. General Motors Corp.*, 743 F.2d 1049, 1052 (4th Cir.

1984), as compared to his "knowledge, skill, experience, training, or education." Fed. R.

Evid. 702.  If the court finds a witness is not qualified to testify on a particular field or on

a given subject, the court will preclude that witness from testifying on that field or

subject.  *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir. 1999) (citing *Holbrook v. Lykes

Bros. Steamship Co., Inc.*, 80 F.3d 777, 781 (3d Cir.1996)).[10]

The Supreme Court in *Daubert* identified several factors that the court may

consider in determining whether testimony is reliable: (1) whether a theory or scientific

technique can or has been tested; (2) whether it "has been subjected to peer review and

publication"; (3) whether the specific scientific technique has a "known or potential rate

of error"; and (4) whether the theory or technique is generally accepted in the "relevant

scientific community."  509 U.S. at 593-94; *see also Kumho Tire*, 526 U.S. at 149-150.

This list of factors, however, "neither necessarily nor exclusively applies to all experts or

in every case."  *Kumho Tire*, 526 U.S. at 141.  Indeed, "[t]he inquiry envisioned by Rule

---

[10] As the proponent of expert testimony, the Government must establish the
admissibility of Dr. McFarland's reports by a preponderance of evidence.  Fed. R. Evid.
702, advisory committee's note on the 2000 amendments (citing *Bourjaily v. United
States*, 483 U.S. 171 (1987)).

702 is . . . a flexible one," *Daubert*, 509 U.S. at 594, and the trial judge has broad

latitude when deciding how to determine reliability, *Kumho Tire*, 526 U.S. at 152.

"Because it is usually impossible to subject nonscientific theories to experimentation,"

the court "should concentrate on the expert's experience, rather than methodology."

*Amco Ukrservice & Prompriladamco v. Am. Meter Co*, No. CIV.A.00-2638, 2005 WL

1541029, at *2 (E.D. Pa. June 29, 2005) (citing *Kumho Tire*, 526 U.S. at 152).

Dr. McFarland's curriculum vitae indicates that he obtained a Ph.D. in Economics

from Northwestern University in 1978.  McFarland Report, Ex. 1, ECF No. 163-2.  His

previous experience includes working as an economist with the Antitrust Division of the

U.S. Department of Justice for over eight years and with the U.S. International Trade

Commission ("ITC") for over three years.  McFarland Report at 1.  Since 1989 he has

been employed as an economic consultant with the firm of Economists Incorporated.

*Id.*

Dr. McFarland testified that his expertise is in economics, which he defined as

"the study of the production and distribution of goods, services, and wealth," and that his

sub-specialties are industrial organization and international trade.  Def.'s Second Mot. *in

Limine*, Ex. 4 (Dr. Henry McFarland Dep. Tr.) ("McFarland Dep.") at 78:25-79:18, ECF

No. 163-5.  He explained that industrial organization "looks at the functioning of

industries and markets to, essentially, see how the activities of production -- and to

some extent, consumption -- are structured."  *Id*. at 79:22-80:1.  He utilized this

expertise while working at the Department of Justice.  *Id*. at 80:2-8.  He further

explained that his subspecialty in international trade led to him conducting "research

studies [while employed at the ITC] concerning transportation costs of imports and how

they have behaved."  *Id.* at 80:17-25.  He also testified that he has "dealt quite a bit with

transportation issues[, a]nd transshipment, obviously, is one of those."  *Id.* at 107:16-18.

Additionally, his report states he has "also worked on matters involving the chemical

industry," and "involving the laws affecting U.S. international trade, including the

antidumping laws."  McFarland Report at 1.  Based on his report and deposition

testimony, the court finds that Dr. McFarland is qualified to give the opinions mentioned

above.[11]

     Defendant argues that Dr. McFarland has no specialized knowledge of saccharin

production to provide an opinion in this case and attacks Dr. McFarland's reliance on

"descriptions of others to assess what factories in Taiwan would look like and require."

Def.'s Second Mot. *in Limine* at 19.  Dr. McFarland testified that he has experience in

exploring various production techniques in the chemical industry from a background

perspective, although admittedly, he does not consider himself a chemist.  McFarland

Dep. at 108:20-109:9.  However, that Dr. McFarland is not a chemist, lacks specialized

knowledge on saccharin production, and lacks personal knowledge of the size of

factories in Taiwan does not render his testimony inadmissible.  Experts may rely on

opinions of other experts on areas outside their expertise. *See Carnegie Mellon Univ.*,

807 F.3d at 1303.  It is not necessary that the basis for their opinions be obtained from

personal perception.  *See Monsanto Co. v. David*, 516 F.3d 1009, 1015 (Fed. Cir.

2008).  Here, Dr. McFarland explained in his report that he relied, in part, on information

regarding saccharin production provided by Dr. Ronald Pearson — who has a Ph.D. in

---

[11] The court finds one aspect of Dr. McFarland's testimony problematic, which the court
discusses below.

organic chemistry and previously was the research and development director of PMC

Specialties, a saccharin producer — in forming his opinion.  McFarland Report at 4

n.14, 8 n.27.  Dr. McFarland was permitted to do so.  *See Carnegie Mellon Univ.*, 807

F.3d at 1303.

Defendant also argues that Dr. McFarland has no specialized training or

knowledge of transshipment necessary to offer an expert opinion in this case.  Def.'s

Second Mot. *in Limine* at 19.  As Dr. McFarland explained, however, his experience with

transportation issues involved transshipment.  Dr. McFarland Dep. at 107:16-18.  As an

economist whose sub-specialties include international trade and transportation, among

other things, Dr. McFarland is qualified to opine on the likelihood of transshipment.

Even more importantly, Dr. McFarland relied on his experience and expertise as an

economist in analyzing numerous economic data in forming his opinions.  For example,

Dr. McFarland's report is based on a review of publicly available data from Taiwan's

Ministry of Finance on the origin of all of Taiwan's imports of saccharin, McFarland

Report at 3-6; Japanese export data as compared to Taiwan's import data, *id.* at 4-6;[12]

U.S. trade statistics on the unit values of Japanese imports into the United States

compared to unit value of all imports as well as the percentage share of imports from

Japan from 2002 to 2012, *id.* at 9-10 & Charts 4-5; and data from Taiwan Customs

related to timing of saccharin imports from China by LH Chemical and exports to the

United States and LH Trading from 2009 to 2012, i.e., the Taiwan Customs Tables

discussed above, *id.* at 11-12.

---

[12] Dr. McFarland collected Japanese export data because Univar identified Japan as a possible source of the subject saccharin.  McFarland Report at 4.

Defendant also argues that Dr. McFarland's experience, which involved reliance on "country-level data," does not render him an expert to analyze statistics on specific shipments, as he did here.  Def.'s Second Mot. *in Limine* at 19-20.  Defendant, thus, argues that Dr. McFarland's general training in interpreting aggregate data is insufficient to qualify him as an expert in analyzing shipment-specific data. *Id*.  Defendant also compares Dr. McFarland to the experts in *In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966 (C.D. Cal. 2012) and *In re Worldcom, Inc.*, 371 B.R. 33, 40 (Bankr. S.D.N.Y. 2007), and avers that, like the experts in those cases, Dr. McFarland's background and training as an economist "provides no basis for the specific opinion he would render." *Id*. at 19.  The court disagrees.

*In re Live Concert Antitrust Litig.*, 863 F. Supp. 2d 966, and *In re Worldcom, Inc.*, 371 B.R. 33, are not as analogous as Defendant suggests.  The court in *In re Live Concert Antitrust Litig.* excluded an economist from testifying on whether a performer qualified as a "rock" artist for the purpose of determining whether concerts are "'rock' concerts" because the witness "ha[d] no expertise in this area."  863 F. Supp. 2d at 994-95.  The witness "was not relying on his experience and expertise as an economist," but rather was "doing the work of a 'music analyst' (or perhaps a lay juror)." *Id.* at 995. The court in *In re Worldcom, Inc.*, excluded an economist from testifying on the appropriate measure of unjust enrichment damages in a lawsuit filed against a telecommunications company because the witness's "education as an economist and his work as a researcher and in litigation support have never given rise to an opportunity to study or know the telecommunications industry or the sales practices therein."  371 B.R. at 41-42.  The court found "no nexus between his credentials and the subject matter of his

testimony." *Id*. at 42.    In contrast to the witness in *In re Live Concert Antitrust Litig.*, Dr.

McFarland relied on his experience and expertise in analyzing the various economic

data, including the shipment-specific data, as outlined above, in rendering his opinion.

For the same reasons, the court finds that there is a nexus between his credentials and

the subject matter of his testimony.

Defendant also argues that Dr. McFarland has no specialized knowledge on

informal economies, either generally or specific to Taiwan's informal economy, to give

an opinion that while Taiwan may have an "underground (or shadow) economy," the

saccharin in question was not likely produced in Taiwan.  Def.'s Second Mot. *in Limine*

at 20; *see also* McFarland Rebuttal Report at 2.  Defendant further argues that Dr.

McFarland's "good deal of work" in industrial organization and international trade do not

provide him with the specialized knowledge to render an opinion on profitability.  *Id*. at

20-21.  Defendant posits there is no indication in Dr. McFarland's report that he has

ever calculated profits in a like manner, suggesting that his opinions were created

specifically for the purpose of litigation.  *Id*. at 20.  These arguments are unavailing.  Dr.

McFarland's rebuttal opinion regarding the likelihood of saccharin production in

Taiwan's shadow economy was rendered on the basis of the information supplied by

Professor Winn regarding the declining nature of the shadow economy.  *See* McFarland

Rebuttal Report.  He is qualified to provide a rebuttal report based on his analysis of the

information supplied by Dr. Winn.

Defendant's challenge to one aspect of Dr. McFarland's testimony has merit.  In

his supplemental report, Dr. McFarland stated that it takes approximately four hours to

"drive from the inner harbor at Keelung to Kaohsiung Harbor . . ., which indicates that

the imports that arrived at Keelung could easily have reached the port of export before the time of the export shipment." McFarland Suppl. Report at 2. By his own admission, Dr. McFarland only has "general knowledge about the size of the island and how fast trucks go." McFarland Dep. at 158:16-21. In the absence of any other basis for his testimony, the court will preclude Dr. McFarland from providing expert testimony on the length of time it takes to travel from Keelung to Kaohsiung Harbor.

The court also finds that Dr. McFarland's testimony is reliable. Dr. McFarland gave a detailed explanation for how he reached his opinion. He testified that as an economist, he would (1) look at trade data; (2) follow methods used by those who typically study underground economies; and (3) look at the various costs and benefits and the incentives of the economic actors. McFarland Dep. at 71:2-20. A review of his reports shows he employed that methodology. First, Dr. McFarland reviewed publicly available data from Taiwan's Ministry of Finance on the origin of all of Taiwan's imports of saccharin, including unfinished acid saccharin and sodium saccharin, from 2003 to 2012, which showed that 98.8 percent of the saccharin imports were from China. McFarland Report at 3-4, 6. Because Univar identified Japan as a possible source of the saccharin, Dr. McFarland collected Japanese export data and compared that with Taiwan's import data. McFarland Report at 4-6. This comparison showed that Taiwan's imports from Japan amounted to less than the volume of Univar's entries at issue. *Id.* at 5 & Chart 2. Dr. McFarland also analyzed the data on the value of those imports from Japan and determined that they had a "substantially higher value per kilogram than the Chinese imports," making it unlikely that the imported saccharin was in unfinished form that was later converted and shipped to the United States. *Id.* at 6. He considered the

potential profitability of a company importing unfinished saccharin from Japan,

converting it, and then shipping it to the United States. *Id.* at 8.  In so doing, he relied,

in part, on information regarding the conversion process of saccharin provided by Dr.

Pearson, an expert in saccharin production. *Id.* at 4 n.14, 8 n.27.  He concluded that

the conversion process would necessitate selling the saccharin in the United States for

a higher price than the unfinished saccharin from Japan if the company were to make a

profit. *Id.* at 8.  Yet, his data comparison showed that in most instances, saccharin

imported into Taiwan from Japan cost more per kilogram than saccharin exported to the

United States. *Id.* at 8-9.  He also considered the fact that Japan was not very

competitive in world saccharin trade. *Id.* at 9-10.  For instance, he looked at the U.S.

trade statistics on the unit values of imports from Japan, which Univar identified as a

possible source of the subject saccharin, into the United States compared to unit value

of all imports as well as the percentage share of imports from Japan from 2002 to 2012.

*Id*. at 10 & Charts 4-5.

        Dr. McFarland tied the data to the facts of this case, for example, concluding that

"[t]he relatively high price of the Japanese product makes it less likely that Japan was a

source of the saccharin at issue in this case," and that the United States imported no

saccharin from Japan in 2010 and 2012. *Id.* at 9-10.  He contrasted Japanese trade

data with those from China, which showed that from 2003 to 2012, the subject

merchandise exported from Taiwan to the United States had a higher value per

kilogram than the merchandise imported into Taiwan from China. *Id.* at 11.  Next, he

looked at the timing of shipments, which included the Taiwan Customs Tables. *Id.* at

11-13.  Further, he considered the possibility of Taiwan's production of the saccharin at

issue.  *Id.* at 13.  Reviewing publicly available data from Taiwan's Ministry of Finance,

Dr. McFarland gathered that this data indicates that from 2003 to 2012, Taiwan

imported more than twice as much saccharin as it exported.  *Id.*  Next, considering the

possibility that there could have been an unlicensed, thus illegal, producer, Dr.

McFarland considered the cost disadvantages of doing so.  *Id.* at 16-18.  His rebuttal

report is based, in part, on the interpretation of studies and data cited by Dr. Winn.  *See*

McFarland Rebuttal Report.

The court further finds that Dr. McFarland's analysis of these various sources will

assist the trier of fact to assimilate this economic data.  Although Defendant complains

of Dr. McFarland "interpret[ing] certain documents," such as certain email

correspondence, which the jury is able to interpret on its own, Def.'s Second Mot. *in*

*Limine* at 8-10 (internal quotation marks omitted), the court finds that the primary

function of Dr. McFarland's testimony is to analyze and interpret the various economic

data, which will be helpful to the jury.  Any disagreements on his reliance, in part, on

certain documents produced in evidence go to the weight rather than admissibility of his

testimony, and Defendant will have the opportunity to cross-examine Dr. McFarland with

respect to his reliance on certain pieces of evidence with which Univar disagrees.  See

*i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91

(2011) ("When [an expert's] methodology is sound, and the evidence relied upon

sufficiently related to the case at hand, disputes about the degree of relevance or

accuracy (above this minimum threshold) may go to the testimony's weight, but not its

admissibility.") (citations omitted).  "[I]t is not the [] court's role under *Daubert* to evaluate

the correctness of facts underlying an expert's testimony."  *Id.* at 856.

   To attack Dr. McFarland's methodology, Defendant first argues that Dr.

McFarland's proposed testimony does not grow "naturally and directly" out of his work

and research outside of this litigation as he "has no 'real world' experience in

transshipment."  Def.'s Second Mot. *in Limine* at 22.  Second, Univar argues that Dr.

McFarland "unjustifiably extrapolated from an accepted premise to an unfounded

conclusion . . . in several ways."  *Id*.  It asserts that Dr. McFarland accepts the Taiwan

Customs data "at face value and believes that those tables reflect transshipment."  *Id.*

Next, it asserts that Dr. McFarland rejects sworn witness testimony in favor of

inadmissible evidence.  *Id*. (citing Def.'s Second Mot. *in Limine*, Exs. 5, 6, ECF Nos.

163-6, 163-7); *see also* McFarland Dep. at 46:1-48:20; 61:7-23.  Third, it argues that Dr.

McFarland failed to account for obvious alternative explanations, such as "swapping,"[13]

when he relied on the timing of the imports and exports reflected in the Taiwan Customs

Tables, to support his view that transshipment occurred.  Def.'s Second Mot. *in Limine*

at 23.  Fourth, Univar classifies Dr. McFarland's principles and methods as inherently

suspect and conclusory.  *Id*. at 24.  Fifth, it argues "there is no field of 'transshipment'

and, thus, there is no field known to reach reliable results for the opinion that Dr.

McFarland would give."  *Id*.

   Notably, Defendant does not cite any authority that outlines best practices for

economic analysis to challenge the methods used by Dr. McFarland.  Indeed, the court

has broad discretion in deciding how to determine reliability.  *See Kumho Tire*, 526 U.S.

at 152.  As noted, because it is usually impossible to subject nonscientific theories, such

---

[13] According to Dr. McFarland, "'swapping' generally means . . . trad[ing] one shipment
for another."  McFarland Dep. 161:5-8.

as the economic theories relevant here, to experimentation, the court may concentrate

on the expert's experience, rather than methodology.  *See, e.g.*, *Amco Ukrservice*, 2005

WL 1541029, at *2 (citing *Kumho Tire*, 526 U.S. at 152).  Here, the court finds that Dr.

McFarland's experience and his detailed explanation of how he analyzed the various

economic data sources render his testimony reliable.  The court has determined that Dr.

McFarland is qualified to give an opinion on transshipment; thus, Defendant's first and

fifth challenges are unavailing.  Defendant's remaining challenges go to the weight

rather than admissibility of Dr. McFarland's testimony.  See *i4i Ltd. P'ship.*, 598 F.3d at

852.  In *Daubert,* the court explained that "[v]igorous cross-examination, presentation of

contrary evidence, and careful instruction on the burden of proof are the traditional and

appropriate means of attacking shaky but admissible evidence."  *Id.* (quoting *Daubert*,

509 U.S. at 596).  Accordingly, for the foregoing reasons, Defendant's second motion *in

limine* is granted in part in that the court will preclude Dr. McFarland from providing

expert testimony on the length of time it takes to travel from Keelung to Kaohsiung

Harbor.  In all other respects, Defendant's second motion *in limine* is denied.

### c.  The Government's Motion in Limine is granted

The Government seeks to exclude the testimony of Mr. O'Rourke[14] concerning

his legal interpretation of the standard of "reasonable care" under 19 U.S.C. § 1592, his

---

[14] Mr. O'Rourke is an attorney who, from 1972 to 1974, worked as a trial attorney in the Customs Section of the Civil Division of the U.S. Department of Justice.  O'Rourke Report ¶ 6.  Thereafter, through 2014, he was a partner at Rode & Qualey, where he represented "a broad range of clients, particularly focusing on toys, wearing apparel and footwear" in customs matters.  *Id.* ¶ 3.  Mr. O'Rourke's practice at Rode & Qualey brought him "in contact on a daily basis with" import specialists, supervisory import specialists, and port directors, among others.  *Id.*  Mr. O'Rourke explained that "[t]his exposure provided and continues to provide, a constant insight into how Customs/CBP operates and interprets issues."  *Id.*  Currently, he is a member of Sandler, Travis &

"purported application of his interpretation of the standard of 'reasonable care' to select facts of this case," and his conclusion that Univar acted with reasonable care in this case.  Pl.'s Mot. *in Limine* at 1.  Mr. O'Rourke's report is divided into two sections: (1) a discussion of "what a reasonable importer of record would do during the 2007-2012 time period to ascertain the country of origin of the merchandise it was importing"; and (2) "whether [Univar] acted reasonably in its efforts to determine the country of origin of the saccharin it imported."  *See* O'Rourke Report at 4, 31 (capitalization omitted).  In the first portion of his report, Mr. O'Rourke explains that his opinion on the appropriate standard for reasonable care derives from his review of CIT decisions, CBP informed compliance publications, CBP rulings, and his personal interaction with importers and CBP employees.  *Id.* ¶¶ 12-69.

Based on a review of those sources, Mr. O'Rourke offers the following opinions on the reasonable care standard: "no one single act . . . equates to the existence or the absence of reasonable care"; "[t]here is no bright line test for reasonable care"; "when considering the presence or absence of reasonable care, it is the totality of circumstances that control the determination if an importer has, in fact, exercised reasonable care"; and "perhaps the best way to answer the question is, has the importer acted in a reasonable manner?"  *Id.* ¶ 124.2-5.  Mr. O'Rourke concludes his report by opining that "[g]iven the full set of circumstances . . . and after reviewing Univar's practices, actions, deposition testimony and Exhibits, and CBP publications, Court

---

Rosenberg, P.A., where his practice includes customs issues such as, *inter alia*, country of origin criteria.  *Id.* ¶ 7.  The Government primarily challenges Mr. O'Rourke's testimony rather than his credentials.

Decisions and CBP rulings cited above, it is my opinion that Univar acted as a reasonable importer." *Id.* ¶ 130.

As noted above, Rule 702 of the Federal Rules of Evidence governs admissibility of expert testimony, and it provides in full:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Monsanto*, 516 F.3d at 1015.   In short, "for an expert witness's testimony to be admissible, it must be reliable, relevant, and helpful to the trier of fact." *G.G. Marck & Assocs., Inc. v. United States*, Slip Op. 15-62, 2015 WL 3757040, *9 (CIT June 17, 2015).

An expert testifying on what the law is or directing the finder of fact how to apply the law to facts is not helpful to the trier of fact in the manner that Rule 702 contemplates. *See, e.g.*, *Stobie Creek Inv. LLC v. United States*, 608 F.3d 1366, 1383 (Fed. Cir. 2010) (holding that because expert testimony must "*assist* the trier of fact to understand the evidence or to determine a *fact* in issue," the trial court did not abuse its discretion in excluding expert testimony relating to proper interpretation of tax laws) (quoting Fed. R. Evid. 702); *Mola Dev. Corp. v. United States,* 516 F.3d 1370, 1379 n.6 (Fed. Cir. 2008) (affording no weight to a witness's affidavit interpreting thrift regulations because the proper interpretation of the regulations concerned an issue of law). Moreover, "expert testimony that amounts to an opinion of law is especially disfavored." *Stobie Creek Invs., LLC v. United States*, 81 Fed. Cl. 358, 360 (2008) (citing *Specht v.*

*Jensen,* 853 F.2d 805, 807 (10th Cir. 1988)).  The court in *Specht* aptly explained the

reasoning behind the rationale for excluding legal opinions:

> While other experts may aid a jury by rendering opinions on ultimate
> issues, our system reserves to the trial judge the role of adjudicating the
> law for the benefit of the jury. When an attorney is allowed to usurp that
> function, harm is manifest in at least two ways. First, . . . the jury may
> believe the attorney-witness, who is presented to them imbued with all the
> mystique inherent in the title "expert," is more knowledgeable than the
> judge in a given area of the law. . . . Second, testimony on ultimate issues
> of law by the legal expert is inadmissible because it is detrimental to the
> trial process. If one side is allowed the right to call an attorney to define
> and apply the law, one can reasonably expect the other side to do the
> same. . . . The potential is great that jurors will be confused by these
> differing opinions, and that confusion may be compounded by different
> instructions given by the court.

*Specht*, 853 F.2d at 808-09 (internal citations omitted).  The trial court "in its role as

gatekeeper, must exclude expert testimony that . . . invades the province of the jury to

find facts and that of the court to make ultimate legal conclusions."  *Sundance, Inc. v.

DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1364 (Fed. Cir. 2008).[15]

Mr. O'Rourke's report states that its purpose is "to provide the [c]ourt with [Mr.

O'Rourke's] opinion of the concept of reasonable care and how it applies to Univar's

transactions."  O'Rourke Report ¶ 122.  Mr. O'Rourke's opinion on the meaning of

reasonable care is based in part on his analysis of the legislative history of the Customs

Modernization and Informed Compliance Act, CIT decisions that have considered

whether an importer exercised reasonable care, and CBP compliance publications and

rulings.  *Id.* ¶¶ 2, 12-40.  He cites excerpts from these sources and explains their legal

---

[15] Although *Sundance, Inc.* involved the issue of whether a patent attorney who lacked
the appropriate technical qualifications could offer an expert opinion on the issues of
patent infringement and validity, 550 F.3d at 1359-65, an issue related to the witness's
expertise, the court's instruction on the gatekeeping role of the trial courts and the
provinces of the judge and jury is pertinent here.

significance.  *Id.* ¶¶ 12-40.  His ultimate opinion on the appropriate standard derives

from his analysis of these sources combined with his personal experience interacting

with CBP employees.  Because it is the role of the court to determine the law and

instruct the jury as to the appropriate standard, Mr. O'Rourke's report exceeds the

scope of permissible expert testimony under Rule 702 and must be excluded.  *See,*

*e.g., Stobie Creek Investments*, 608 F.3d at 1383-84.  Moreover, Mr. O'Rourke's

opinion that Univar acted with reasonable care must also be excluded because it

invades the province of the jury's fact-finding function.

Defendant's argument that there is no "specialized legal meaning" that attaches

to the concept of reasonable care, thereby rendering Mr. O'Rourke's opinion

permissible is undermined by Mr. O'Rourke's own report analyzing the statute and legal

opinions to come to his determination on the appropriate standard.  Def.'s Resp. at 7-14

(citing, *inter alia*, *United States v. Barile*, 286 F.3d 749, 760 (4th Cir. 2002) ("To

determine when a question posed to an expert witness calls for an improper legal

conclusion, the district court should consider first whether the question tracks the

language of the legal principle at issue or of the applicable statute, and second, whether

any terms employed have specialized legal meaning.")).  The court is well equipped to

undertake the task of determining the applicable legal standard on reasonable care and

instructing the jury on that standard without the help of an expert.  *See, e.g., Stobie*

*Creek Investments*, 608 F.3d at 1384 (holding that a proposed expert's opinion would

not have assisted the trial court "because [the witness's] proposed testimony consisted

of a lengthy legal analysis of past precedent and assumed key factual representations .

. . were accurate, when in actuality they were false . . . .").

Defendant argues Mr. O'Rourke's opinion is necessary to help the jury because "[w]hat typical importers do to verify the country of origin of merchandise they are importing is not a 'matter of common knowledge.'"  Def.'s Resp. at 7.  However, Mr. O'Rourke's opinion does not speak to the actions of typical importers, nor does it explain that it derives from what is customary practice for importers in the trade industry. Rather, his opinion is based in large part on his examination of the statute, court rulings, and CBP rulings and compliance publications.  In so doing, Mr. O'Rourke operates outside the proper scope of an expert witness.  Because proper interpretation of the reasonable care standard is an issue of law, Mr. O'Rourke's opinion relating to this issue will be excluded.

Defendant's other arguments in support of admitting Mr. O'Rourke's testimony are not persuasive.  Defendant argues that Mr. O'Rourke's testimony is analogous to the expert testimony of lawyers in legal malpractice cases, which is regularly permitted. Def.'s Resp. at 5 (citing *Floyd v. Hefner*, 556 F. Supp. 2d 617, 643 (S.D. Tex. 2008); *Huddleston v. Herman & MacLean*, 640 F. 2d 534 (5th Cir. 1981) *aff'd in part, rev'd in part on other grounds,* 459 U.S. 375 (1983)).  The cases that Univar cites do not stand for the proposition that a lawyer may testify as to purely legal matters.  In *Floyd*, which involved legal malpractice and breach of fiduciary duty claims, the court permitted an experienced lawyer with significant background in professional ethics, 556 F. Supp. 2d at 642, to testify as to the "standard of care of a reasonably prudent attorney" and allowed the witness to "apply[] his legal understanding to the factual matters at issue," *id.* at 643-44 (citing *Waco Int'l, Inc. v. KHK Scaffolding Houston Inc.,* 278 F.3d 523, 533 (5th Cir. 2002)).  In *Huddleston*, which involved claims of securities fraud, the court held

that it was proper to permit a lawyer to testify that a statement in a prospectus was standard language used in connection with the issuance of a new security because that information related to the factual issue of defendants' scienter.  640 F.2d at 552.  In the latter case, the lawyer's testimony was appropriate to help the jury understand the fact in evidence — the meaning of prospectus boilerplate language in the securities industry — that was relevant to determining defendants' culpability.  *See id.*  What these cases demonstrate is that a witness may testify as to legal matters that involve a question of fact; they do not establish, however, that expert testimony is appropriate when it attempts to define the legal parameters within which the jury must exercise its fact-finding function, which is what Mr. O'Rourke attempts to do.  The case to which *Floyd* cites supports this proposition.  *See* 556 F. Supp. 2d 643-44 (citing *Waco Int'l Inc.*, 278 F.3d at 533 ("Although a lawyer may not testify as to purely legal matters, he or she may testify as to legal matters that involve questions of fact.")).

Additionally, citing Rule 704, Defendant also argues that Mr. O'Rourke's opinion is not objectionable "just because it embraces an ultimate issue."  Def.'s Resp. at 14 (quoting Fed. R. Evid. 704 advisory committee's note to the 1972 proposed rules).  While expert testimony may embrace an ultimate issue, such testimony does not go unchecked.  The advisory committee's note to Rule 704 plainly states

> The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day. They also stand ready to exclude opinions phrased in terms of inadequately explored legal criteria.

Fed. R. Evid. 704 advisory committee's note to the 1972 proposed rules.  Simply put, under Rule 702, the judge determines the law — in this case, the standard for reasonable care — and instructs the jury as to that applicable law; the question of whether Univar acted with reasonable care is a question reserved for the jury.  Mr. O'Rourke's opinion on the standard of reasonable care usurps the court's role and his conclusion that Univar acted with reasonable care is, in effect, telling the jury what result to reach.

Consequently, because Mr. O'Rourke's testimony would invade the province of the court and the jury, it exceeds the scope of permissible expert testimony under Rule 702, and will be excluded.  Therefore, the Government's motion *in limine* is granted.

### CONCLUSION AND ORDER

For the foregoing reasons, the court **DENIES** Defendant's first motion *in limine* (ECF No. 142), **GRANTS**, in part, and **DENIES**, in part, Defendant's second motion *in limine* (ECF No. 163), and **GRANTS** the Government's motion *in limine* (ECF No. 152). Parties are to consult and are hereby **ORDERED** to file a joint status report or joint proposed order for amending and/or supplementing their summary judgment papers no later than April 3, 2018.

/s/      Mark A. Barnett
Judge

Dated: March 2, 2018____
         New York, New York