Slip Op. 18-157

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| UNITED STATES,<br><br>               Plaintiff,<br><br>    v.<br><br>UNIVAR USA INC.,<br><br>               Defendant. | Before: Mark A. Barnett, Judge<br>Court No. 15-00215<br><br>**PUBLIC VERSION** |

## MEMORANDUM AND ORDER

[Defendant's Motion for Summary Judgment is denied.]

Dated: November 13, 2018

<u>Reta E. Bezak</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for Plaintiff. With her on the brief were <u>Chad A. Readler</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, <u>Patricia M. McCarthy</u>, Assistant Director, <u>Stephen C. Tosini</u>, Senior Trial Counsel, and <u>William G. Kanellis</u>, Trial Attorney.

<u>Lucius B. Lau</u>, White & Case LLP, of Washington, DC, argued for Defendant. With him on the brief were <u>Gregory J. Spak</u>, <u>Sadie L. Gardner</u>, and <u>Jessica E. Lynd</u>.

       Barnett, Judge:  In this action, the United States of America ("Plaintiff" or the

"Government") seeks to recover unpaid duties and a monetary penalty pursuant to

Section 592 of the Tariff Act of 1930, as amended, 19 U.S.C. § 1592 (2012),[1] plus

interest, costs, and attorney fees, stemming from 36 entries of saccharin, allegedly

transshipped from the People's Republic of China ("China") through the Republic of

---

[1] Further citations to the Tariff Act of 1930, as amended, are to the relevant portions of Title 19 of the U.S. Code, 2012, edition, which are the same in all relevant respects to the versions in effect when the entries were made.

China ("Taiwan"), which Univar entered into the commerce of the United States between 2007 and 2012.  *See generally* Compl., ECF. No. 2.  Before the court is Defendant, Univar USA Inc.'s ("Univar" or "Defendant") motion for summary judgment. Confidential Univar's Mot. For Summ. J., ECF No. 143, and Confidential Univar USA Inc.'s Mem. of P. & A. in Supp. of its Mot. for Summ. J. ("Def.'s Mem."), ECF No. 143-2. Defendant seeks summary judgment with respect to all entries.  *See* Def.'s Mem. at 1-2. Alternatively, Defendant seeks dismissal of Plaintiff's penalty claims, asserting that U.S. Customs and Border Protection ("Customs" or "CBP") failed to comply with the statutory obligations of Section 592(b)(2), thereby depriving this court of subject matter jurisdiction.  Def.'s Mem. at 42-44; Confidential Univar USA Inc.'s Reply in Supp. of its Mot. for Summ. J. ("Def.'s Reply") at 19-21, ECF No. 161.  The motion is fully briefed,[2] and the court held oral argument on May 23, 2018.  *See* Docket Entry, ECF No. 192; Oral Arg. Tr., ECF No. 196.  For the reasons discussed below, Defendant's motion for summary judgment is denied.

---

[2]*See* Def.'s Mem.; Confidential Pl.'s Opp'n. to Univar's Mot. For Summ. J. ("Pl.'s Opp'n"), ECF No. 154; Def.'s Reply; Confidential Univar USA Inc.'s Suppl. Br. in Supp. of its Mot. for Summ. J. ("Def.'s Suppl. Mem."), ECF No. 184; Confidential Pl.'s Resp. to Univar's Suppl. Br. in Supp. of its Mot. for Summ. J. ("Pl.'s Resp. to Def.'s Supp. Mem."), ECF No. 188; Univar USA Inc.'s Comments Regarding Pl.'s Exhibit, Rule 801d(2) of the Federal Rules of Evidence, and Annotated Chart Two ("Def's 2nd Suppl. Mem."), ECF No. 193; Pl.'s Mot. for Leave to Respond to Univar's Suppl. Br. and Resp. ("Pl.'s Resp. to Def's 2nd Suppl. Mem."), ECF Nos. 195, 198.

**BACKGROUND**

### I.  Evidentiary Objections

Pursuant to United States Court of International Trade ("USCIT") Rule 56.3(a), a motion for summary judgment must include a separate document that contains a "short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried."  The movant must follow each statement with citation to evidence that would be admissible.  USCIT Rule 56.3(c). Citations may be to "particular parts of materials in the record," such as "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  USCIT Rule 56(c)(1)(A).  Pursuant to USCIT Rule 56(c)(2), "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."

In compliance with USCIT Rule 56.3, the parties have filed their proposed statements of facts and supported those statements with citations to evidence.  *See generally* Confidential Univar's Rule 56.3 Statement in Supp. of its Mot. For Summ. J. ("DSOF"), ECF No. 143-3; Confidential Pl.'s Rule 56.3 Counterstatement of Fact ("PCSOF"), ECF No. 154-1; Confidential Univar USA Inc.'s Rebuttal to Pl.'s Rule 56.3 Counterstatement ("Def.'s Resp. to PCSOF"), ECF No. 161-1; Confidential Univar USA Inc.'s Suppl. Rule 56.3 Statement ("Suppl. DSOF"), ECF No. 184-1; Confidential Pl.'s Conditional Suppl. Rule 56.3 Counterstatement of Fact ("Suppl. PCSOF"), ECF No.

188-1.[3]   Plaintiff has cited numerous exhibits to support its statements of fact.  *See*

*generally* PCSOF.[4]   Univar objects to the admission of nearly all of Plaintiff's exhibits on

the grounds of hearsay or relevance.  The disputed evidence can be grouped in four

general categories.

---

[3] Subsequent to Univar's filing of the instant motion, the parties filed motions *in limine*. *See* Mem. and Order (Mar. 2, 2018) ("Order on Mots. *In Limine*"), ECF No. 177 (resolving three motions *in limine*).  After ruling on these motions, the court invited the parties to file a joint status report or proposed order for amending or supplementing their summary judgment papers.  *Id.* at 36.  The parties agreed that Univar would file a supplemental brief, limited to 10 pages, to its summary judgment briefing.  Stip. and Proposed Joint Scheduling Order Concerning Suppl. Summ. J. Briefing at 2, ECF No. 180.  Thereafter, Univar filed a supplemental brief consisting of 10 pages and appended a separate statement of material facts as support.  *See* Def.'s Suppl. Mem.; Suppl. DSOF.  Plaintiff requests that the court reject Defendant's Supplemental Rule 56.3 statement as impermissible.  Pl.'s Resp. to Def.'s Supp. Mem. at 2.  The court's order inviting the parties to supplement their "summary judgment papers" was not limited to briefs only, nor did the parties' stipulation include such a limitation.  Moreover, USCIT Rule 56.3(a) requires that a party file its factual positions in a "separate, short and concise statement."  For these reasons, the court will not reject Defendant's supplemental Rule 56.3 statement.
[4] Plaintiff's opposition memorandum includes 23 attachments.  *See* Pl.'s Opp'n., Attachs. 1-23, ECF Nos. 154-3 to 154-25; *see generally* Decl. of Stephen C. Tosini ("Tosini Decl."), ECF No. 154-2.  Some of the attachments include multiple numbered deposition exhibits.  The parties refer to Plaintiff's attachments as "Ex." or "Gov. Ex." *See, e.g.,* PCSOF ¶ 220 (referring to Plaintiff's attachment 12, which is Deposition exhibit 11, as "Ex. 12").  For clarity and ease of reference, the court's initial citation refers to Plaintiff's exhibits as "Attach." and, where applicable, includes in parenthesis the deposition exhibit number, i.e.: Pl.'s Attach __, (Dep. Ex. __).  Any subsequent citations are to the deposition exhibit number only.  Additionally, where helpful to identify the particular portion of an exhibit, the court provides the pin cite to the Bates Number, ECF page number, or both.  The court refers to Plaintiff's supplemental exhibits in the manner in which they have been identified, i.e.: Pl.'s Suppl. A1, *etc.  See* Confidential Pl.'s Suppl. App. in Supp. of its Opp'n to Univar's Mot. for Sum. J., ECF No. 191. During oral argument, Plaintiff proffered an additional exhibit, *see* Ex. 1, ECF No. 192, to which the court refers as "Pl.'s OA Ex. 1."

The first category of evidence to which Univar objects includes emails sent by Univar employees to Univar agents or third parties.  For convenience, the exhibits, the relevant corresponding source where Univar makes the objection, and a brief description of the exhibit are set forth in the following table:

| Table 1 | | | |
|---|---|---|---|
| Item No. | Plaintiff's Exhibit | Brief Description | Univar's Objection |
| 1 | Pl.'s Attach. 1 at Univar_011207, ECF No. 154-3 at p. 4 | Email from Hung-yao Chin ("Mr. Chin")[5] to Thomas Biggs ("Mr. Biggs")[6] | Hearsay.  Def.'s Resp. to PCSOF ¶ 206 |
| 2 | Pl.'s Attach. 1 at Univar_014737, ECF No. 154-3 at p. 9 | Email from Mr. Biggs to third party | Hearsay.  Def.'s Resp. to PCSOF ¶ 246 |
| 3 | Pl.'s Attach. 1 at Univar_066462, ECF No. 154-3 at p. 13 | Email from Mr. Biggs to Mr. Chin | Hearsay.  Def.'s Resp. to PCSOF ¶ 205 |
| 4 | Pl.'s Attach. 2 (Dep. Ex. 162), ECF No. 154-4 at p. 367 | Email from a Univar General Manager to Mr. Biggs and others | Hearsay.  Def.'s Resp. to PCSOF ¶ 227 |
| 5 | Pl.'s Attach. 2 (Dep. Ex. 163), ECF No. 154-4 at p. 371 | Email from a Univar General Manager to Mr. Biggs | Hearsay.  Def.'s Resp. to PCSOF ¶¶ 225-226, 260 |
| 6 | Pl.'s Attach. 2 (Dep. Ex. 288), ECF No. 154-4 at pp. 144-147 | Emails from Mr. Biggs and Mr. Chin | Hearsay.  Def.'s Resp. to PCSOF ¶¶ 191-193 |
| 7 | Pl.'s Suppl. A7 (Dep. Ex. 215), ECF No. 191 at p. 9 | Email from a Univar employee to third party | Hearsay.  Def.'s Resp. to PCSOF ¶ 198 |
| 8 | Pl.'s Attach. 2 (Dep. Ex. 311), ECF No. 154-4 at p. 268 | Email from Mr. Biggs to Mr. Chin | Hearsay.  Def.'s Resp. to PCSOF ¶ 210 |

[5] Univar refers to Mr. Chin as its independent contractor.  Def.'s Resp. to DSOF ¶ 135.
[6] Mr. Biggs was the director of Univar's International Sourcing Group.  PCSOF ¶ 185; Def.'s Resp. to PCSOF ¶ 185.

| 9 | Pl.'s Attach. 2 (Dep. Ex. 316), ECF No. 154-4 at p. 285 | Email from Mr. Biggs to third party | Hearsay.  Def.'s Resp. to PCSOF ¶¶ 200, 244 |
|---|---|---|---|
| 10 | Pl.'s Attach. 2 (Dep. Ex. 312), ECF No. 154-4 at p. 269 | Email from Mr. Chin to Mr. Biggs | Hearsay.  Def.'s Resp. to PCSOF ¶ 207 |
| 11 | Pl.'s Attach. 2 (Dep. Ex. 314), ECF No. 154-4 at pp. 275-282 | Email from a Univar employee attaching an Application for Kosher Certification | Hearsay.  Def.'s Resp. to PCSOF ¶¶ 203, 213, 237 |
| 12 | Pl.'s Attach. 2 (Dep. Ex. 318), ECF No. 154-4 at p. 292 | Email from Mr. Biggs to third party | Hearsay.  Def.'s Resp. to PCSOF ¶ 212 |
| 13 | Pl.'s Attach. 2 (Dep. Ex. 323), ECF No. 154-4 at p. 337 | Email from a Univar employee to at least one other Univar employee | Hearsay.  Def.'s Resp. to PCSOF ¶ 217 |
| 14 | Pl.'s Attach. 2 (Dep. Ex. 327), ECF No. 154-4 at p. 345 | Email thread between Univar employees | Hearsay.  Def.'s Resp. to PCSOF ¶ 224 |
| 15 | Pl.'s Attach. 2 (Dep. Ex. 328), ECF No. 154-4 at pp. 350-351 | Univar internal email | Hearsay.  Def.'s Resp. to PCSOF ¶ 242 |
| 16 | Pl.'s Attach. 2 (Dep. Ex. 329), ECF No. 154-4 at p. 353 | Email from a Univar General Manager to at least one other Univar employee | Hearsay.  Def.'s Resp. to PCSOF ¶ 228 |

The second category of evidence includes emails or other written communications sent to Univar employees or agents by third parties:

| Table 2 | | | |
|---|---|---|---|
| Item No. | Exhibit | Brief Description | Objection |
| 1 | Pl.'s Attach. 1 at UNIVAR_USCIT-0531, ECF No. 154-3 at pp. 87-88 | Email from William Huang to Mr. Chin | Hearsay.  Def.'s Resp. to PCSOF ¶ 186 |

| 2 | Pl.'s Attach. 1 at Univar 13344-47, ECF No. 154-3 at pp. 5-8 | Email from Food and Drug Administration ("FDA") to a Univar employee | Hearsay. Def.'s Resp. to PCSOF ¶ 198 |
| 3 | Pl.'s Attach. 2 (Dep. Ex. 310), ECF No. 154-4 at p. 266 | Email from a third party to a Univar employee | Hearsay. Def.'s Resp. to PCSOF ¶ 209 |
| 4 | Pl.'s Attach. 2 (Dep. Ex. 313), ECF No. 154-4 at pp. 271-274 | Fax from Mr. Biggs to William Huang | Hearsay. Def.'s Resp. to PCSOF ¶ 211 |
| 5 | Pl.'s Attach. 2 (Dep. Ex. 315), ECF No. 154-4 at p. 283 | Production process flow chart | Hearsay. Def.'s Resp. to PCSOF ¶¶ 186, 203, 213, 237 |
| 6 | Pl.'s Attach. 2 (Dep. Ex. 317), ECF No. 154-4 at p. 290 | Email from a third party to a Univar employee | Hearsay. Def.'s Resp. to PCSOF ¶ 208 |
| 7 | Pl.'s Attach. 2 (Dep. Ex. 322), ECF No. 154-4 at p. 336 | Email to a Univar employee | Hearsay. Def.'s Resp. to PCSOF ¶ 216 |
| 8 | Pl.'s Attach. 2 (Dep. Ex. 325), ECF No. 154-4 at p. 343 | Email from a third party to a Univar employee | Hearsay. Def.'s Resp. to PCSOF ¶ 218 |
| 9 | Pl.'s Attach. 11 (Dep. Ex. 12), ECF No. 154-13 at p. 4 | Letter from U.S. Immigration and Customs Enforcement ("ICE") to Univar | Hearsay. Def.'s Resp. to PCSOF ¶ 220 |

The third category of evidence includes Univar's internal documents, such as trip notes, inspection reports, letters or memoranda, and a PowerPoint presentation:

| Table 3 | | | |
|---|---|---|---|
| Item No. | Exhibit | Brief Description | Objection |
| 1 | Pl.'s Attach. 2 (Dep. Ex. 303), ECF No. 154-4 at pp. 245-250 | Mr. Biggs's "2005 Korea-Taiwan Trip Notes" | Hearsay. Def.'s Resp. to PCSOF ¶ 235 |
| 2 | Pl.'s Attach. 2 (Dep. Ex. 306), ECF No. 154-4 at pp. 258-261 | Mr. Biggs's 2008 "Korea-Taiwan Visit notes" | Hearsay. Def.'s Resp. to PCSOF ¶ 236-238 |

| 3 | Pl.'s Attach. 2 (Dep. Ex. 297), ECF No. 154-4 at p. 217 | Inspection Report | Hearsay.  Def.'s Resp. to PCSOF ¶ 190 |
| 4 | Pl.'s Attach. 2 (Dep. Ex. 298), ECF No. 154-4 at p. 218 | Inspection Report | Hearsay.  Def.'s Resp. to PCSOF ¶ 190 |
| 5 | Pl.'s Attach. 2 (Dep. Ex. 179), ECF No. 154-4 at p. 387-397 | Univar Internal Memorandum | Hearsay.  Def.'s Resp. to PCSOF ¶¶ 195-196 |
| 6 | Pl.'s Attach. 18 (Dep. Ex. 277), ECF No. 154-20 | Univar Internal Letter | Hearsay.  Def.'s Resp. to PCSOF ¶ 239 |
| 7 | Pl.'s Attach. 2 (Dep. Ex. 292), ECF No. 154-4 at p. 164 | Univar PowerPoint Presentation | Hearsay.  Def.'s Resp. to PCSOF ¶ 221 |

The remaining evidence includes deposition testimony of two witnesses; an affidavit and an email, including exhibits, of Special Agent Wally Tsui ("Mr. Tsui"), who assisted in the investigation of the alleged transshipment; a 2017 version of the Taiwan's Customs Act; and statistical tables:

| Table 4 | | | |
|---|---|---|---|
| Item No. | Exhibit | Brief Description | Univar's Objection |
| 1 | Pl.'s Attach. 6 & Pl.'s Suppl. A3 ("Ritell Dep.") at 56, 71-72, ECF Nos. 154-8, 191 | Dep. Excerpt of Bruce Ritell | Hearsay; best evidence rule.  Def.'s Resp. to PCSOF ¶ 190 |
| 2 | Pl.'s Attach. 8 ("Talmid Dep.") at 53-54, ECF No. 154-10 | Dep. Excerpt of Rabbi Haim Talmid | Hearsay.  Def.'s Resp. to PCSOF ¶ 219 |
| 3 | Aff. of Special Agent Wally Tsui in Supp. of Pl.[']s Opp'n to Univar's Mot. for Partial Summ. J. ("Tsui Aff.") ¶¶ 8-27, ECF No. 32-11 | Affidavit | Hearsay.  Def.'s Resp. to PCSOF ¶ 190 |
| 4 | Tsui Aff., Ex. 2, ECF No. 32-13 | Photographs | Hearsay.  Def.'s Resp. to PCSOF ¶ 204 |

| 5 | Pl.'s Attach. 14 (Dep. Ex. 129), ECF No. 154-16 at p. 1 | Email enclosing a business card | Hearsay.  Def.'s Resp. to PCSOF ¶¶ 186, 199, 204 |
|---|---|---|---|
| 6 | Pl.'s Attach. 23, ECF No. 154-25 | Taiwan Customs Act | Relevance.  Def.'s Reply at 9 |
| 7 | Pl.'s Resp. to Def.'s Mot. *in Limine* to Exclude Taiwan's Records Showing Transshipment from China Through Taiwan to the United States, Ex. 1 ("Taiwan Customs Tables"), ECF No. 145-1 | Tables reflecting imports of saccharin from China into Taiwan and exports of saccharin from Taiwan to the United States | Hearsay; Inadmissible to Prove Habit.  Def.'s Resp. to PCSOF ¶ 201; Def.'s Mem. at 7-8; 24-27; *see also* DSOF ¶ 42; PCSOF ¶ 42 |

Hearsay is an out of court statement offered "to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  Hearsay is inadmissible at trial unless a federal statute, Federal Rule of Evidence, or other rule prescribed by the Supreme Court provides otherwise.  Fed. R. Evid. 802.  The court may nonetheless "consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form."  *United States v. Sterling Footwear, Inc.*, 41 CIT __, __, 279 F. Supp. 3d 1113, 1124-25 (2017) (quoting *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1293–94 (11th Cir. 2012)). Indeed, more generally, "for summary judgment purposes, the inquiry is whether the cited evidence may be reduced to admissible form, not whether it is admissible in the form submitted at the summary judgment stage."  *Id.* at 1124 (citing USCIT Rule 56(c)(2)).

"A common type of statement that falls outside the hearsay definition, because it is not offered for its truth, is a statement that is offered to show its effect on the

recipient." *Bady v. Murphy-Kjos*, 628 F.3d 1000, 1003 (8th Cir. 2011) (quoting *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999)).  Additionally, a statement that "is offered against an opposing party and . . . was made by the party's agent or employee on a matter within the scope of that relationship and while it existed" is not hearsay. Fed. R. Evid. 801(d)(2)(D).  Likewise, if an opposing party creates an email incorporating content created by other individuals such that the opposing party may be said to have adopted the contents as true or believed to be true, such incorporated content is not hearsay.  *See Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 454 F. Supp. 2d 966, 973 (C.D. Cal. 2006); Fed. R. Evid. 801(d)(2)(B) (a statement is not hearsay if it is "offered against an opposing party and . . . is one the party manifested that it adopted or believed to be true").  The court may also consider hearsay statements that are specifically exempted from the hearsay rule.  *See* Fed. R. Evid. 803, 804.  Relevant here, any "statement[s] of the declarant's then-existing state of mind,"[7] Fed. R. Evid. 803(3), and business records,[8] Fed. R. Evid. 803(6), are exceptions to the hearsay rule.

---

[7] Pursuant to Rule 803, "[a] statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed," unless in circumstances not applicable here, is exempted from the rule against hearsay.  Fed. R. Evid. 803(3).

[8] Rule 803(6) exempts from the hearsay rule,
> A record of an act, event, condition, opinion, or diagnosis if:
> (A) the record was made at or near the time by--or from information transmitted by--someone with knowledge;
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
> (C) making the record was a regular practice of that activity;

As to the first category of evidence (Table 1), the emails sent by Univar agents or employees are not hearsay and Univar's objection is overruled.  *See* Fed. R. Evid. 801(d)(2)(D).  To the extent other content was incorporated into those emails, and to the extent Univar's agents or employees manifested that they adopted or believed that the content was true, the incorporated content is admissible pursuant to Fed. R. Evid. 801(d)(2)(B).  With respect to emails sent by Mr. Chin, to whom Univar refers as its independent contractor, *see* DSOF ¶ 135; Def.'s Resp. to PCSOF ¶ 191, the court finds that Mr. Chin was an agent of Univar for purposes of Fed. R. Evid. 801(d)(2)(D).  First, "the precise contractual relationship between the agent and the party against whom the evidence is offered" is not determinative for purposes of Fed. R. Evid. 801(d)(2)(D).  *Metro-Goldwyn-Mayer Studios*, 454 F. Supp. 2d at 973-74.  Second, notwithstanding its assertion that Mr. Chin was an independent contractor, Univar itself referred to Mr. Chin as "our representative."  Def.'s Mem., Attach. 29 (Univar Fed. R. Civ. P. 30(b)(6) Dep.) 114:11-12, ECF No. 143-5.  Therefore, Mr. Chin's emails are not hearsay.

Regarding emails or other written communications sent to Univar employees or agents by third parties (Table 2), Plaintiff refers to those emails and communications not to prove the matters asserted therein, i.e.*,* that the saccharin was being transshipped from China through Taiwan, but, instead, to address Univar's level of culpability.

---

(D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
(E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.
Fed. R. Evid. 803(6).

*Compare* Pl.'s Opp'n at 4-6, 15-22 (discussing evidence concerning country of origin),

*with* Pl.'s Opp'n at 23-26 (discussing evidence concerning Univar's gross negligence in

ascertaining the country of origin), *and* Table 2.  At oral argument, Plaintiff clarified that

it presented certain evidence to demonstrate Univar's awareness of its supplier's

asserted lack of a Taiwanese production facility and Univar's actions in the context of

reasonable care.  *See* Oral Arg. Questions (May 18, 2018) ¶ 5, ECF No. 190; Oral Arg.

Tr. at 22-24 (discussing Pl.'s Attach. 2 (Dep. Exs. 310, 315, 317, 322)).  Defendant had

no objection to the admissibility of those exhibits for that limited purpose.  Oral Arg. Tr.

at 29-30.  Therefore, Univar's objection to emails or other communications sent by third

parties to Univar's employees or agents is overruled to the extent that this evidence is

offered for the limited purpose of showing its effect on the recipient and Univar's

knowledge and state of mind with regard to saccharin production in Taiwan.  *See Bady*,

628 F.3d at 1003; *Metro-Goldwyn-Mayer Studios*, 454 F. Supp. 2d at 974.

  Similarly, Univar's internal documents, such as trip notes, inspection reports,

letters or memoranda, and a PowerPoint presentation (Table 3) are admissible pursuant

to Fed. R. Evid. 801(d)(2)(D).  The director of Univar's International Sourcing Group, Mr.

Biggs, who had the "ultimate authority within Univar [] to approve [foreign] suppliers,"

took notes on his trips to Taiwan in 2005 and 2008 and authenticated those trip notes

during his deposition.  *See* Pl.'s Attach. 2 ("Biggs Dep.") 69:14-21 (discussing Mr.

Biggs's authority at Univar), 128:16-18, 133:3-12 (discussing Dep. Ex. 303), 139:16-

140:9 (discussing Dep. Ex. 306), ECF No. 154-4.  The letter, memoranda, and

PowerPoint presentation bear Univar's company name or logo and were composed and

shared by its agents or employees.  *Metro-Goldwyn-Mayer Studios*, 454 F. Supp. 2d at

974.  These items fall squarely within the ambit of Fed. R. Evid. 801(d)(2)(D).[9]

As to the remaining evidence set forth in Table 4, one item is an excerpt from the

deposition testimony of Rabbi Haim Talmid of the Orthodox Union, a kosher certification

agency.  *See* Talmid Dep.; Biggs Dep. 217:19-20; Table 4 Item No. 1.   From 2005 to

2013, the Orthodox Union certified the subject saccharin as kosher.  *See* DSOF ¶ 115;

PCSOF ¶ 115.  Rabbi Talmid testified that he flew to Taiwan three times to inspect the

saccharin factory of Univar's supplier so that the Orthodox Union could continue to

certify the saccharin as kosher.  Talmid Dep. 53:1-68:13.  On each occasion, Rabbi

Talmid was told he could not inspect the plant because, respectively, the plant was shut

down, there was a dangerous flood, or there was dangerous construction preventing

access to the factory.  *Id*.  Univar objects to Rabbi Talmid's testimony concerning his

conversations with third parties regarding the reasons for the inability to access the

factory as inadmissible hearsay.  Def.'s Resp. to PCSOF ¶ 219.  Plaintiff is not offering

the testimony to prove that the factory was, indeed, shut-down for a period of time, or

---

[9] Deposition Exhibit 297 is a 2007 inspection report by Univar's European affiliate and Deposition Exhibit 298 is a 2012 inspection report by Univar.  *See* Dep. Exs. 297, 298. Mr. Biggs testified that Univar normally utilizes inspection reports for its food grade products.  Biggs Dep. 113:10-16.  Specifically in the context of Deposition Exhibit 298, he testified that Univar "had a consistent process, whether it was from Europe or from the [United States] or from one of [its] China colleagues" in completing the inspection reports.  *Id*.  Because these inspection reports are prepared by Univar's employees based on their inspections, they are opposing party statements pursuant to Rule 801(d)(2)(D).  Alternatively, based on Mr. Biggs's testimony, these reports could be reduced to admissible form as business records pursuant to Rule 803(6).  *See* Biggs Dep. 111:15-112:11, 113:5-16.

the existence of a flood or construction near the factory.  *See* PCSOF ¶ 219.  Rather,

the testimony is offered to prove Univar's knowledge or state of mind during this

relevant time-frame with respect to the origin of its product. *See id.*; Oral Arg. Tr. at 37

("[I]t goes to Univar's understanding of where their product was coming from.").

Therefore, the objection is overruled.

Plaintiff also relies on the deposition testimony of Bruce Ritell ("Mr. Ritell") of Rit-

Chem, a U.S. importer who purchased saccharin from High Trans Corporation ("HTC"),

a Taiwanese producer, from 2004 to 2016.  *See* Ritell Dep. 25:14-19, 30:21-31:4, 70:8-

71:6; Table 4 Item No. 2.  The Government relies on Mr. Ritell's testimony that Rit-

Chem was "the sole [U.S.] purchaser of saccharin from HTC during [the] relevant time

period."  PCSOF ¶ 190 (citing Ritell Dep. at 72-73).  In the cited testimony, Mr. Ritell

references an "exclusivity agreement" between HTC and Rit-Chem, and further testified

as to his knowledge of HTC's production capacity and annual output.  *See* Ritell Dep.

72:2-73:18.  Univar objects to the Government's reliance on Mr. Ritell's recollection of

an "exclusivity agreement" and invokes the best evidence rule.  *See* Def.'s Resp. to

PCSOF ¶ 190 (citing, *inter alia*, Fed. R. Evid. 1002); *see also* Oral Arg. Tr. 47-48.  The

Government points out that in addition to the exclusivity agreement, Mr. Ritell testified

as to his personal knowledge of HTC's annual production of saccharin, and the degree

to which Rit-Chem and HTC's other customers were responsible for purchasing that

production amount.  Oral Arg. Tr. at 86.

To the extent that the Government relies on Mr. Ritell's recollection of an

exclusivity agreement, Univar's objection is sustained.  Rule 1002 requires production of

  
the original of a document, such as an exclusivity agreement, to prove its contents.  *See*

Fed. R. Evid. 1002.  Rule 1004 provides circumstances in which production of an

original is excused and other evidence of the content of a writing is admissible;

however, Plaintiff has not asserted that those circumstances exist here.   Univar did not

object to the remaining portions of Mr. Ritell's testimony.  *See* Ritell Dep. 72:1-16-73:3-

18; Def.'s Resp. to PCSOF ¶ 190.  Therefore, the court will consider the remaining

testimony.

Concerning the affidavit of Agent Tsui,[10] Univar objects to paragraphs 8 through

27 and exhibit 2 on hearsay grounds.  *See* Def.'s Resp. to PCSOF ¶ 190; Table 4 Item

Nos. 3-4.  Pursuant to USCIT Rule 56(c)(4), "[a]n affidavit or declaration used to support

or oppose a motion must be made on personal knowledge, set out facts that would be

admissible in evidence, and show that the affiant or declarant is competent to testify on

the matters stated."  The court notes that the affidavit is made under "penalty of perjury"

and is said to be "true and correct."  Tsui Aff. at 15; 28 U.S.C. § 1746 (governing

unsworn declarations made under penalty of perjury).  There is no indication that Agent

Tsui is not "competent" to testify; thus, the issue is whether the affidavit is based on

---

[10] Agent Tsui "was a Special Agent with the Department of Homeland Security (DHS), U.S. Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), from 2004 through 2015."  Tsui Aff. ¶ 1.  His duties included "the investigation of . . . customs violations involving illegal entry of goods . . . into the United States."  *Id.* He "was assigned to the Office of International Affairs, ICE Attaché in Hong Kong from 2009 through 2013, with an area of investigative responsibility that encompassed Hong Kong, Taiwan and Macau."  *Id.* ¶ 2.

personal knowledge and states "facts that would be admissible in evidence." USCIT

Rule 56(c)(4).

The court finds that paragraphs 10, 11, and 13 through 16 are not hearsay

because they convey information based on Agent Tsui's personal knowledge and

observation.  *See* Tsui Aff. ¶¶ 10-11, 13-16 (discussing Agent Tsui's visits to Taiwan in

April and June 2010, the purpose of his visits, and his personal observations).  In

contrast, paragraphs 8, 9, 12, and 17 through 27 recount Agent Tsui's telephone and

email conversations with Teddy Weng ("Mr. Weng") from HTC concerning HTC's

corporate and manufacturing office locations, its corporate officers' identities, the

identity of its U.S. client, and, largely, HTC's relationship with Univar's saccharin

supplier.  *Id.* ¶¶ 8-9, 12, 17-27.

The Government acknowledged during oral argument that to the extent any of

those paragraphs convey information from HTC about HTC's relationship with Univar's

saccharin supplier, they constitute hearsay.  Oral Arg. Tr. at 24.  The Government

asserted that it does not intend to have a representative of HTC testify at trial.  *Id*.

Thus, those hearsay statements could not be reduced to admissible form.  The

Government argued, however, that this evidence is nonetheless admissible pursuant to

the residual exception of Fed. R. Evid. 807.  *Id.* at 25.

Pursuant to Rule 807, a hearsay statement not otherwise covered by a hearsay

exception is admissible if:

> (1) the statement has equivalent circumstantial guarantees of
> trustworthiness;
> (2) it is offered as evidence of a material fact;

> (3) it is more probative on the point for which it is offered than any
> other evidence that the proponent can obtain through reasonable
> efforts; and
> (4) admitting it will best serve the purposes of these rules and the
> interests of justice.

Fed. R. Evid. 807(a).[11]  The drafters of the rule "intended that the residual hearsay

exceptions will be used very rarely, and only in exceptional circumstances."  Fed. R.

Evid. 803(24) advisory committee's note to 1974 Enactment.[12]  When admitting

evidence pursuant to Rule 807, the court must make detailed findings concerning the

facts and circumstances that indicate that the statement has a sufficiently high degree

of trustworthiness justifying its admission.  *See id.*; *F.T.C. v. Figgie Int'l, Inc.*, 994 F.2d

595, 608 (9th Cir. 1993) ("District courts must make detailed findings when admitting

evidence under Rule [807].").[13]

        The court recognizes that the Government is offering paragraphs 8, 9, 12, and 17

through 27 of Agent Tsui's affidavit as evidence of material facts, satisfying the second

---

[11] Rule 807 also has a notice requirement, which is not at issue here.  Fed. R. Evid.
807(b).
[12] In 1997, the contents of Rule 803(24) and 804(b)(5) were combined and transferred
to Rule 807.  Fed. R. Evid. 807 advisory committee's note to 1997 amendment.
[13] Factors that may weigh on the trustworthiness inquiry can vary widely and
include:

> whether the declarant had a motivation to speak truthfully or otherwise;
> the spontaneity of the statement[;] . . . whether the statement was under
> oath; whether the declarant was subject to cross-examination at the time
> the statement was made; the relationship between the declarant and the
> person to whom the statement was made; whether the declarant has
> recanted or reaffirmed the statement; whether the statement was recorded
> and particularly whether it was videotaped; and whether the declarant's
> firsthand knowledge is clearly demonstrated.

2 Kenneth S. Broun, *McCormick on Evidence* § 324 (7th Ed. 2013) (footnotes omitted).

prong of Rule 807.  *See* Fed. R. Evid. 807(2); PCSOF ¶¶ 190, 199, 202, 204.  The

Government suggests that the statements in those paragraphs are "more probative on

the point[s] for which [they are] offered than any other evidence that the proponent can

obtain through reasonable efforts" because the Government attempted to contact HTC

personnel through the issuance of a letter rogatory but received an incomplete

response.  *See* Fed. R. Evid. 807(3); Oral Arg. Tr. at 24; Pl.'s Mot. for Leave to File A

Status Report and Status Report, Ex. B, ECF Nos. 175, 175-2 (HTC's incomplete

response to letter rogatory).  Of concern to the court, however, is a lack of adequate

explanation for why Mr. Weng's statements to Agent Tsui have "equivalent

circumstantial guarantees of trustworthiness" to any of the other hearsay exceptions.

*See* Fed. R. Evid. 807(a).  The Government contends that the affidavit "recount[s] the

contents of the reports of investigation, which were made contemporaneous[ly] and with

his visits and his discussions with those individuals."  Oral Arg. Tr. at 25.  In other

words, according to the Government, these statements offer "equivalent circumstantial

guarantees of trustworthiness" to the hearsay exception set forth in Rule 803(8)(A)(iii).

Rule 803(8)(A)(iii) exempts from the hearsay rule "[a] record or statement of a public

office if [] it sets out . . . in a civil case . . ., factual findings from a legally authorized

investigation."  Fed. R. Evid. Rule 803(8)(A)(iii).

A review of Agent Tsui's reports of investigation ("ROI") demonstrates that the

paragraphs in his affidavit merely introduce the information contained in the ROI.

*Compare* Tsui Aff. ¶¶ 8-9, 12, 17-27, *with* Tsui Aff., Ex. 1 (ROI) at 63-64, ECF No. 32-

12; *see also* Tsui Aff. ¶ 5 (stating that the ROI contains Agent Tsui's "contemporaneous

recordation of events related to the Univar investigation.")  The paragraphs in the

affidavit and the ROI appear to be merely a transcript of Agent Tsui's interview with Mr.

Weng.  Without further information on the record, the court cannot make the detailed

findings regarding the "special facts and circumstances which, in the court's judgment,

indicate[]" that Mr. Weng's statements to Agent Tsui have "a sufficiently high degree of

trustworthiness and necessity to justify [their] admission;" therefore, the court sustains

Univar's objections with respect to those paragraphs.  *See* Fed. R. Evid. 803(24)

advisory committee's note to 1974 Enactment*; F.T.C.*, 994 F.2d at 608.

　　　The court likewise sustains Univar's objection concerning the email authored by

Agent Tsui and the attachment therein.  *See* Dep. Ex. 129; Def.'s Resp. to PCSOF

¶¶ 186, 199, 204; Table 4 Item No. 5.  Agent Tsui's email contains, as an attachment, a

purported "business card" of William Huang ("Mr. Huang") that lists Mr. Huang as the

president of Long Hwang Chemical Co. ("LH Chemical") and Lung Huang Trading

Company, Ltd. ("LH Trading").  Dep. Ex. 129.  The Government is offering this business

card to show the truth of the matter asserted therein—that Mr. Huang was the president

of both companies—and to establish the address for those companies.  *See* PCSOF ¶¶

186, 199, 204; Oral Arg. Tr. at 20, 21, 29.  Plaintiff has offered no justification why this is

not hearsay.  Plaintiff argues that this document is nonetheless admissible to impeach

Mr. Huang's testimony regarding the location of the saccharin production facility and his

lack of affiliation with LH Chemical.  *See* Pl.'s Resp. to Def.'s 2nd Suppl. Mem. at 4

(citing Fed. R. Evid. 613(b)).  Rule 613(b) permits introduction of "extrinsic evidence of a

*witness's* prior inconsistent statement" under certain circumstances.  Fed. R. Evid.

613(b) (emphasis added).  In this email, Agent Tsui states that he received the business

card from a "Taiwan source."  Dep. Ex. 129.  In his affidavit, he explains that the Taiwan

source was Mr. Weng.[14]  *See* Tsui Aff. ¶ 8, 27.  Therefore, the Government has not

shown that this exhibit contains a statement by Mr. Huang, such that it would be

admissible for impeachment purposes pursuant to Rule 613(b).

With respect to Exhibit 2 to Agent Tsui's affidavit, the court, pursuant to its

discretion, may admit photographs as substantive or illustrative evidence, provided that

the proponent lays a proper foundation for the photographs.  *See United States v. May*,

622 F.2d 1000, 1007 (9th Cir. 1980); Fed. R. Evid. 901(a).  Mr. Tsui's affidavit states

that Exhibit 2 includes "true and correct photographs of the site that [he] visited [in June

2010] from Google maps."  Tsui Aff. ¶ 15.  Thus, the photographs are illustrative of his

visit, properly authenticated, and therefore admissible.

The remaining evidentiary objections of Univar are based on relevance.  *See*

Table 4 Item Nos. 6-7.  The Government relies on certain provisions of the Taiwan

Customs Act, as amended on January 18, 2017, to establish import and export

declaration requirements in Taiwan as they pertain to the 2009-2012 saccharin entries.

*See* PCSOF ¶ 58, 62-63; Pl.'s Attach. 23; Table 4 Item No. 6; *see also* Pl.'s Opp'n at 16

---

[14] "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  One way of authenticating an item of evidence is through the testimony of a witness with knowledge stating that "that an item is what it is claimed to be."  Fed. R. Evid. 901(b)(1).  The Government has failed to authenticate Exhibit 129 because Mr. Tsui does not have personal knowledge that the business card belongs to Mr. Huang.  Rather, the extent of his knowledge is that Mr. Weng produced the business card.

(citing Taiwan Customs Act, arts. 10, 16, 18, 44).  Univar objects to the relevance of

Taiwan Customs Act, as amended on January 18, 2017, to establish the status of

Taiwanese law during the 2009 to 2012 time period.  Def.'s Reply at 9.  During oral

argument, the Government provided a print-out from the Global Legal Information

Network displaying a history of the revisions to this Act, but asserted it had difficulty

obtaining the English translation of the language of the amendments.  *See* Oral Arg. Tr.

at 10-11; Pl.'s OA Ex. 1.  The Government's new exhibit shows, and both Univar and

the Government acknowledge, that only Article 10 of this Act has been amended since

2012.  *See* Pl.'s OA Ex. 1; Def.'s 2nd Suppl. Mem. at 2; Oral Arg. Tr. at 10-11.

Relevant evidence is that which "has any tendency to make a fact more or less

probable than it would be without the evidence; and . . . the fact is of consequence in

determining the action."  Fed. R. Evid. 401.  Because the court cannot ascertain

whether the current language of Article 10 is substantively the same as the language of

Article 10 as it existed in the relevant period, the current version is irrelevant and,

therefore, inadmissible.  The court overrules Univar's objection with respect to the

remaining provisions of the Taiwan Customs Act.

During the course of discovery, Plaintiff procured four versions of tables from the

Department of Investigation, Customs Administration, Ministry of Finance, Republic of

China ("Taiwan Customs") that purport to reflect imports of saccharin from China into

Taiwan by LH Chemical and exports of saccharin from Taiwan to the United States

made by LH Trading during the period 2009 to 2012.   DSOF ¶ 42; PCSOF ¶ 42;

Taiwan Customs Tables; Table 4 Item No. 7.  While these Taiwan Customs Tables

concern only imports and exports to and from Taiwan from 2009 to 2012, Plaintiff seeks

to rely on this evidence as relevant to the shipments in 2007 and 2008, asserting they

prove a habit of transshipment by Mr. Huang.[15]  *See* Pl.'s Opp'n at 17-19.  Univar

objects to the admissibility of the Taiwan Customs Tables for this purpose.  *See* Def.'s

Mem. at 24-27; Def.'s Reply at 5-8.

> Rule 406 provides that
>
> [e]vidence of a person's habit or an organization's routine practice may be
> admitted to prove that on a particular occasion the person or organization
> acted in accordance with the habit or routine practice. The court may
> admit this evidence regardless of whether it is corroborated or whether
> there was an eyewitness.

Fed. R. Evid. 406.  "[B]efore a court may admit evidence of habit, the offering party must

establish the degree of specificity and frequency of uniform response that ensures more

than a mere 'tendency' to act in a given manner, but rather, conduct that is 'semi-

automatic' in nature."  *Simplex, Inc. v. Diversified Energy Sys., Inc.*, 847 F.2d 1290,

1293 (7th Cir. 1988); *see also* Fed. R. Evid. 406 advisory committee's note to the 1972

proposed rules ("The doing of the habitual acts may become semi-automatic in nature").

The Government has failed to establish that the Taiwan Customs Tables

demonstrate conduct by Mr. Huang or his purported companies that is "'semi-automatic'

in nature."  The Taiwan Customs Tables indicate that between 2009 and 2011, LH

Chemical imported from China 20 shipments of sodium saccharin into Taiwan from five

---

[15] Between 2007 and 2012, Univar made 36 entries of saccharin into the United States.
PCSOF ¶ 181; Def.'s Resp. to PCSOF ¶ 181; *see also* DSOF ¶ 2; Gov's Resp. to DSOF
¶ 2.  Univar made 20 entries in 2007 and 2008 and 16 entries between 2009 and 2012.
DSOF ¶¶ 13, 48; PCSOF ¶¶ 13, 48.

different sellers at two different ports of entry.  *See* Taiwan Customs Tables at ECF p. 5.

The mesh sizes (reflecting the particle size), quantities, and weight of these imports

vary.  *See id.*  The Taiwan Customs Tables also indicate that between 2009 and 2012,

LH Trading exported 16 shipments of sodium saccharin to the United States, and Univar

was the importer.  Taiwan Customs Tales at ECF p. 6.  The Government argues that

these tables, which represent "the evidence of transshipment between 2009 and 2012"

are "relevant regarding the alleged transshipment of pre-2009 entries."  Pl.'s Opp'n at

17.  The activities of LH Chemical and LH Trading, during the 2009-2012 period, do not

reflect the type of uniform conduct that would suggest a habit or routine practice for

purposes of Rule 406.  Notwithstanding the fact that LH Chemical imported from China

and LH Trading exported to the United States, differences in the shipments—including

different suppliers and different ports—make the Taiwan Customs Tables insufficiently

probative with respect to the 2007 and 2008 entries.  Therefore, the court sustains

Univar's objection to the use of these tables to establish a habit of Mr. Huang or routine

practice of his purported companies relative to the earlier time period.

     Lastly, the Government objects to the admissibility of an affidavit upon which

Univar relies in support of its summary judgment motion.  *See* DSOF ¶ 60; PCSOF

¶ 60; Def.'s Mem., Attach. 38 (Aff. of Sun, Chia Ling) ("Sun Aff."), ECF No. 143-5.

Univar relies on the affidavit of Chia Ling Sun ("Ms. Sun"), a branch manager at ECI

Taiwan Co. Ltd., which is a subsidiary of Expeditors International, a global "logistics and

freight forwarding company."  Sun. Aff. ¶ 1.  Univar relies on Ms. Sun's affidavit to

establish a definition of the "import declaration date" as reflected in the Taiwan Customs

Tables and the length of time it typically takes for goods to clear customs in Taiwan.
*See* Def.'s Mem. at 9-12.

Ms. Sun opines that "to the best of [her] knowledge, the import declaration date is
the date on which the customs documentation (the 'declaration') is submitted to the
Taiwanese customs authority with respect to a particular shipment of imported goods."
Sun Aff. ¶ 3.  According to Ms. Sun, "[t]hese documents are normally submitted when
the shipment arrives in Taiwan," and "[o]nce goods arrive in Taiwan by ship, it typically
takes four to five working days for those goods to clear customs and an additional one
working day for those cleared goods to be delivered to a local consignee." *Id.* ¶ 3-4.
Ms. Sun concluded that "to the best of [her] knowledge, it typically takes six working
days for goods to clear customs and be delivered locally after arrival in Taiwan by ship."
*Id.* ¶ 4.

Plaintiff objects to Univar proffering Ms. Sun's "undisclosed expert report in
conjunction with its motion for summary judgment," but has no objection to Univar
bringing Ms. Sun "to the United States for deposition and trial."  PCSOF ¶ 60; Pl.'s
Opp'n at 3 n.1.[16]  At oral argument, Univar maintained that Ms. Sun is a lay witness,
within the ambit of Rule 701, who may permissibly opine upon matters within her

---

[16] Plaintiff states that "Univar proffers testimony from three previously undisclosed
Taiwanese expert witnesses," but objects only to Ms. Sun's affidavit.  *See* Pl.'s Opp'n at
3 n.1 (citing Sun Aff.; Def.'s Mem., Attach. 40 (Decl. of Chen Che-Hung), ECF No. 143-
5 at pp. 842-44; Def.'s Mem., Attach. 40 (Written Test. of Secretary General, Kaohsiung
Yuan City Chamber of Commerce) ("Chamber of Commerce Test."), ECF No. 143-5 at
pp. 845-46); DSOF ¶¶ 131-133; PCSOF ¶¶ 131-133 (not disputing Univar's statements
of facts for which Univar cites Attachment 40 as evidence).

personal knowledge.  Oral Arg. Tr. at 6-7.  The Government countered that Ms. Sun is

an expert, within the ambit of Rule 702, whose testimony is purely based on her

experience at Expeditors International.  Oral Arg. Tr. at 8-9.

      Rule 701 permits a lay witness to testify on matters "rationally based on the

witness's perception," helpful to a clear understanding of the determination of a fact in

issue, and "not based on scientific, technical, or other specialized knowledge within the

scope of Rule 702."  Fed. R. Evid. 701.  The rule was amended in 2000 to add the latter

portion "to eliminate the risk that the reliability requirements set forth in Rule 702 will be

evaded through the simple expedient of proffering an expert in lay witness clothing."[17]

Fed. R. Evid. 701 advisory committee's note to 2000 amendments.  Nevertheless, "the

line between expert testimony under [Rule] 702 ... and lay opinion testimony

under [Rule] 701 ... is not easy to draw."  *Kahrs Int'l, Inc. v. United States*, 33 CIT 1297,

1302 (2009) (quoting United States v. Ayala–Pizarro,407 F.3d 25, 28 (1st Cir. 2005)).

      Many courts, including the U.S. Court of International Trade, "have permitted

specialized opinion testimony, without first qualifying the witness as an expert, because

'the particularized knowledge that the witness has [is derived] by virtue of his or her

position in the business.'"  *Kahrs Int'l,* 33 CIT at 1302 (alteration in original) (citations

omitted) (quoting Fed. R. Evid. 701 advisory committee's note to 2000 amendments);

*see also Lerner New York, Inc. v. United States*, Slip-Op. 11-149, 2011 WL 6019334

(CIT Dec. 5, 2011) (citing Fed. R. Evid. 701 advisory committee's note to 2000

---

[17] Pursuant to Rule 702, an expert is "[a] witness who is qualified as an expert by
knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.

amendments).  Pursuant to this standard, the court finds that Ms. Sun's affidavit is not

admissible as opinion testimony by a lay witness.

        Based on her 10-year employment with Expeditors International, Ms. Sun states

that she has "developed a deep familiarity with Expeditors' day-to-day customs

operations in Taiwan by assisting importers and exporters through processing

documentation, calculating duties, arranging for inspections, [and] arranging for

delivery."  Sun Aff. ¶ 1.  Ms. Sun, however, indicates that her experience is limited to the

Taipei location and she does not provide any indication of having personal knowledge

relevant to food additive or chemical import/export practices.  While Ms. Sun provides

her opinion on questions posed by Univar's counsel, she provides no linkage between

those opinions and her personal knowledge for the court to consider.  Thus, Ms. Sun's

affidavit does not constitute lay witness testimony admissible pursuant to Rule 701.

See Fed. R. Evid. 701(a) (lay witness's testimony must be "rationally based on the

witness's perception").  Moreover, Ms. Sun's affidavit may not be considered as expert

testimony because Univar has neither sought to qualify it as such and has not disclosed

it in accordance with the court's scheduling order.  *See* Order (Nov. 25, 2015), ECF No.

16.  Accordingly, the court will not consider Ms. Sun's affidavit for purposes of ruling on

Univar's summary judgment motion.

        To the extent the parties' remaining evidentiary objections concerned issues

already addressed in the court's order resolving previously filed motions *in limine*, that

order remains undisturbed and the court need not re-address those objections here.

*See* Order on Mots. *In Limin*e (addressing admissibility of Taiwan Customs Tables

concerning the 2009 to 2012 entries and expert reports).

## II.  Facts Not Genuinely in Dispute

Upon review of the parties' facts (and supporting exhibits) and taking into

account the above evidentiary rulings, the court finds there is no genuine dispute with

the following material facts.[18]

### A.  Saccharin and the Antidumping Duty Order

Saccharin is a non-nutritive sweetener generally used in beverages and foods,

personal care products, table top sweeteners, and animal feeds.  *Saccharin from the*

*People's Republic of China*, 68 Fed. Reg. 40,906, 40,907 (Dep't Commerce July 9,

2003) (notice of antidumping duty order) ("*AD Order*").  There are four primary chemical

compositions of saccharin: (1) sodium saccharin;[19] (2) calcium saccharin; (3) acid or

insoluble saccharin; and (4) research grade saccharin.  *Id.*  Acid saccharin may refer "to

a crude form of the product that is . . . further processed to make sodium saccharin."

Pl.'s Attach. 20 (Expert Report of Henry B. McFarland, Ph.D.) ("McFarland Report") at 2,

---

[18] Citations are provided to the relevant paragraph number of the undisputed facts and response; internal citations generally have been omitted.  Citations to the record are provided when a fact is controverted based on objections to the cited evidence, the court has overruled the objection, and the fact is supported by the proponent's cited evidence.  Citations to the record are also provided when a fact, though not admitted by both parties, is uncontroverted by record evidence.  *See* USCIT Rule 56(c)(3)("The court need consider only the cited materials, but it may consider other materials in the record.").

[19] Chemists refer to "sodium saccharin" and "saccharin sodium" interchangeably.  Def.'s Mem., Attach. 33 (Expert Report of Leonard J. Chyall, Ph.D) ("Chyall Report") ¶ 28, ECF No. 143-5.

ECF No. 154-22; *see also* Chyall Report ¶ 38 (stating that a chemical process to prepare sodium saccharin may use acid saccharin as the starting point).

The "mesh size" of saccharin refers to the particle size of the product.  Def.'s Mem., Attach. 36 (Expert Report of Michael Coffield) ¶ 7, ECF No. 143-5.  "A common method used to characterize the particle size . . .  is to pass the material through a standard wire mesh screen."  DSOF ¶ 83; PCSOF ¶ 83.  "[M]esh screen openings . . . are classified according to the number of openings along a linear inch of the mesh"; "the larger the numerical value of the mesh size, the smaller the opening."  DSOF ¶¶ 83, 85; PCSOF ¶¶ 83, 85.  Thus, a high numerical value of the mesh size corresponds with small physical particles of the material.  DSOF ¶ 86; PCSOF ¶ 86.

In July 2003, the U.S Department of Commerce ("Commerce") issued an antidumping duty order covering saccharin from China.  PCSOF ¶ 179; Def's Resp. to PCSOF ¶ 179; *see also AD Order*.  At all times relevant to this action, the China-wide antidumping duty rate for imported saccharin was 329.33 percent or 329.94 percent. PCSOF ¶ 180; Def.'s Resp. to PCSOF ¶ 180.

### B.  Univar and the Subject Entries

Univar[20] "is the leading chemical distributor in the United States, providing more chemical products and related services than any other company in the marketplace." PCSOF ¶ 178; Def.'s Resp. to PCSOF ¶ 178.  Prior to 2003, Univar imported saccharin

---

[20] At all times relevant to the matters described in Plaintiff's complaint, Defendant was a wholly-owned subsidiary of Univar Inc.  PCSOF ¶ 177; Def.'s Resp. to PCSOF ¶ 177. Defendant objects to Plaintiff referring to Defendant and Univar Inc. interchangeably as "Univar."  Def.'s Resp. to PCSOF ¶ 178. The court refers only to Defendant as "Univar."

from China.  PCSOF ¶ 184; Def.'s Resp. to PCSOF ¶ 184.  After Commerce issued the

antidumping duty order, Univar internally declared itself "temporarily out of the sodium

saccharin business" while it considered other sources for its saccharin imports.   DSOF

¶ 153;[21] Def.'s Mem., Attach. 51 (Univar internal email), ECF No. 143-5; PCSOF ¶ 184;

Def.'s Resp. to PCSOF ¶ 184.

Mr. Biggs is the director of Univar's International Sourcing Group, PCSOF ¶ 185;

Def.'s Resp. to PCSOF ¶ 185, and had the "ultimate authority within Univar [] to approve

[foreign] suppliers, Biggs Dep. 69:14-21.  After Commerce issued the antidumping duty

order, Mr. Biggs consulted the World Wide Directory of Chemical Producers to search

"for non-Chinese manufacturers [of saccharin]."[22]  DSOF ¶ 139; PCSOF ¶ 139; Def.'s

Mem. at 18.  He sent a list from that database to Mr. Chin, who then informed Mr. Biggs

that Mr. Huang was "the only viable manufacturer in Taiwan."  DSOF ¶ 140; PCSOF

¶ 140.

---

[21] Univar relies on the opinions of its proposed expert, Michael O'Rourke, as evidentiary support for some of its statements of fact.  Because the court has previously determined that Mr. O'Rourke's testimony is inadmissible, *see* Order on Mots. *In Limin*e at 29-36, it has not considered Univar's Rule 56.3 statements of fact that are supported only with Mr. O'Rourke's report, but has considered those statements that are supported with additional cited evidence.

[22] Shortly before Commerce issued the *AD Order*, in April of 2003, Mr. Biggs had inquired into purchasing saccharin from a Spanish company.  *See* DSOF ¶ 156; Def.'s Mem., Attach. 47 (Univar USA, Inc.'s Resp. to Pl.'s First Set of Interrogs., Reqs. for Admiss. and Reqs. for Produc. of Docs. to Third-Party Def.) ("Univar's Resp. to Pl.'s First Set of Disc. Req.") at 26, ECF No. 143-5; *see also* Def.'s Mem., Attach. 53 (Email to Mr. Biggs), ECF No. 143-5.  Upon receiving information that saccharin imported into the United States from the Spanish company would have originated in China, Mr. Biggs declined to purchase saccharin from this company. Univar's Resp. to Pl.'s First Set of Disc. Req. at 26.

In October 2003, Mr. Chin obtained prices from Mr. Huang "of [LH] Chemical" and reported those prices to Mr. Biggs.  PCSOF ¶ 191; Dep. Ex. 288 at UNIVAR_013664-013665.  Mr. Huang quoted a price of $3,850 per metric ton ("MT") for 20-40 mesh size saccharin delivered freight on board in Taiwan.[23]  *See* PCSOF ¶ 192; Dep. Ex. 288 at UNIVAR_013664-013665.  Univar was informed that the quoted price was higher than the price for saccharin from China but lower than the price for saccharin from Japan.  *See* Dep. Ex. 288 at UNIVAR_013664; *see also* PCSOF ¶ 194; Def.'s Resp. to PCSOF ¶ 194 (Mr. Biggs "understood that [in October 2003], Japanese product was more expensive than $3,850" per MT).

"Univar began the process of approving LH Trading/LH Chemical as a supplier in late 2003, early 2004."  PCSOF ¶ 195; Dep. Ex. 179.[24]  At that time, LH Trading/LH Chemical were not registered with the FDA.  *See* Dep. Ex. 179 at Univar_069041 ("FDA Registration NO: will advies [sic] !!!!!!");  Biggs. Dep. 79:22-23, 81:15-20.  As of January 8, 2004, Univar completed the FDA registration for these companies, and listed LH Trading as the supplier and LH Chemical as the manufacturer in the registration documents.  Dep. Ex. 215 (Univar email containing FDA registration number); Pl.'s

---

[23] A "20-40" mesh size "refers to saccharin that will pass through a [Number] 20 mesh screen but not a Number 40 mesh screen."  DSOF ¶ 87; PCSOF ¶ 87 (alteration in original).  On the other hand, a "10-40" mesh size "refers to saccharin that will pass [through] a Number 10 mesh screen but not a Number 40 mesh screen."  DSOF ¶ 87; PCSOF ¶ 87 (alteration in original).
[24] Exhibit 179 is an internal Univar memorandum containing a December 9, 2003 Import Product/Vendor Request and a January 2, 2004 Import Product Profile.  Dep. Ex. 179.  The December 2003 request lists LH Trading as foreign supplier and manufacturer, and the January 2004 product profile lists LH Chemical as the manufacturer.  *See id.* at Univar_069039, Univar_069041.

Attach. 3 (Dep. of Annie Chang) ("Chang Dep.") 58:3-59:12 (discussing email).  The

final registration listed the address for both companies as: 19 Lane 142 Wen Chu Road

4FL Tso Ying Dist. Kaohsiung, Taiwan.  Dep. Ex. 215; *see also* Chang Dep. 59:6-9.

In April 2004, Mr. Biggs visited Taiwan and met with Mr. Huang, the president of

LH Trading.  DSOF ¶ 124; PCSOF ¶¶ 124, 185; Def.'s Resp. to PCSOF ¶ 185.  The

purpose of this visit was to conduct "an inspection for . . . a new supplier."  DSOF ¶ 124;

PCSOF ¶ 124.  Mr. Huang informed Mr. Biggs that he owned a factory in Taiwan that

manufactured saccharin.  PCSOF ¶ 187; Def.'s Resp. to PCSOF ¶ 187.  During this

visit, Mr. Biggs and Mr. Huang toured a factory in Taiwan.  *See* PCSOF ¶ 189; Def.'s

Resp. to PCSOF ¶ 189.  However, the factory that they toured was owned by HTC.

PCSOF ¶ 190; Def.'s Resp. to PCSOF ¶ 190.  HTC's factory is located at 115 Qinan

Road, Dashe District, Kaohsiung City 815.  DSOF ¶ 17; PCSOF ¶ 17.

By May 2004, Univar had begun importing saccharin from Taiwan.  *See* PCSOF

¶ 200; Dep. Ex. 316 at Univar_066465; Biggs Dep. 167:21-23.  On August 30, 2004,

Univar submitted an application for kosher certification to the Orthodox Union, indicating

it promotes its "artificial sweetener" as a "food additive."[25]   *See* Dep. Ex. 314 at

Univar_065703.  Univar listed LH Chemical—located at 4 Fl. Number 19, Lane 142,

---

[25] The kosher certification application included a production process flow chart.  *See*
Dep. Ex. 314 at Univar_065709.  According to this document, the source of Mr. Huang's
acid saccharin was "Sei Cheng Chemical Co., Ltd, (Japan)."  *Id.*; Dep. Ex. 315; *see also*
PCSOF ¶ 213; Def.'s Resp. to PCSOF ¶ 213 (O-Sulfobenzoic acid imide is acid
saccharin).

Wen Chu Road, Tso Ying District, in Kaoshiung, Taiwan—as the manufacturer, and Mr.

Huang as LH Chemical's president. *Id.* at Univar_065704.

On or around March 10, 2005, Rabbi Grunberg from the Orthodox Union visited

the plant owned by "[LH] Chemical," located in "Tso Ying Dist, Kaohsiung, Taiwan" to

inspect the facility for purposes of certifying the plant as kosher. Def.'s Mem., Attach. 1

(Rabbi Grunberg Inspection Report), ECF No. 143-5; DSOF ¶¶ 144-45; PCSOF ¶¶ 144-

45. That year, the Orthodox Union certified the plant as kosher. DSOF ¶ 145; PCSOF

¶ 145. Subsequent to Rabbi Grunsberg's visit, Rabbi Talmid flew to Taiwan three times

to inspect the saccharin factory so that the Orthodox Union could continue to certify it as

kosher. Talmid Dep. 53:1-68:13.[26] On each occasion, Rabbi Talmid was told that he

could not inspect the plant because, respectively, the plant was shut down, there was a

dangerous flood, or there was dangerous construction preventing access to the factory.

*Id.* Between 2007 and 2012, the Orthodox Union was unable to inspect Mr. Huang's

factory. Biggs Dep. 218:6-9, 219:12-220:4. Nonetheless, from 2005 to 2013, the

Orthodox Union continuously certified the saccharin that Univar purchased from Mr.

Huang as kosher. DSOF ¶ 145; PCSOF ¶ 145.

Between July 9, 2007, and April 3, 2012, Univar made 36 entries of saccharin

into the United States. PCSOF ¶¶ 181, 183; Def.'s Resp. to PCSOF ¶¶ 181, 183; *see*

*also* DSOF ¶¶ 2, 13; PCSOF ¶¶ 2, 13. Specifically, Univar made 20 entries in 2007 and

2008, and 16 entries between 2009 and 2012. DSOF ¶¶ 13, 48; PCSOF ¶¶ 13. 48.

---

[26] In order to re-certify a product as kosher, the Orthodox Union requires annual
inspection of the production facility. Talmid Dep. 60:9-15; *see also id.* 58:21-59:1.

Univar declared Taiwan as the country of origin for all entries of subject merchandise. *See* DSOF ¶ 3 ("The '36 entries of saccharin' identified by the government in its [p]re-[p]enalty [n]otice form the basis of this action); PCSOF ¶ 3; PCSOF ¶ 183; ("Univar entered, introduced, or caused to be entered or introduced, merchandise consisting of 'saccharin and its salts' under the entry numbers, entered values, and duties paid listed in the [p]re-[p]enalty [n]otice"); Def.'s Resp. to PCSOF ¶ 183; Univar's Resp. to Pl.'s First Set of Disc. Req. at 16 ("Univar admits that it asserted at the time of entry that the country of origin was Taiwan for all entries of [s]ubject [m]erchandise identified in the [p]re-[p]enalty [n]otice").

Univar received a certificate of origin issued by the Kaohsiung Yuan City Chamber of Commerce for each of the 36 entries.  DSOF ¶ 133; PCSOF ¶ 133.  "The Kaohsiung Yuan City Chamber of Commerce is authorized by the Taiwan Board of Foreign Trade to issue certificates of origin."  DSOF ¶ 131; PCSOF ¶ 131.  Issuance of the certificates "is a routine business activity," DSOF ¶ 132; PCSOF ¶ 132, and occurs upon receipt of an application by an exporter and "on the basis that the customs declaration information is verified to be correct," Chamber of Commerce Test. ¶ 5.

In December 2008, Univar participated in a "[c]ustoms mock-audit" conducted by DHL Global Forwarding ("DHL").  *See* Def.'s Mem., Attach. 2 (Letter from DHL to Univar) at Univar_DHS-003553, ECF No. 143-5; Pl.'s Attach. 10 (Dep. Ex. 11), ECF No. 154-12.  DHL is a licensed corporate U.S. Customs broker that helps importers with "the preparation and submission of the entry and entry summary documentation of Customs in association with their importations."  Def.'s Mem., Attach. 15 (DHL Fed. R. Civ. P.

30(b)(6) Dep.) 17:16-18:2.    DHL concluded that Univar is a "good importer," with a

"culture of compliance."  DSOF ¶ 160; PCSOF ¶ 160 (initial capitalization omitted).

According to DHL's corporate representative, "[d]uring [the] approximately 18-year

period" that DHL has conducted these audits, no company "received a perfect score,"

but Univar "received a score of 90 to 92 percent," which "is probably at or a little above

the normal average."  DSOF ¶ 161; PCSOF ¶ 161.  Moreover, this representative

believed that "a good importer" need not "actually visit the factory located in a foreign

country before purchasing from that factory."  DSOF ¶ 127; PCSOF ¶ 127.

### C.  Third Party Communications to Univar and Univar's Reactions

In August 2004, shortly after Univar began importing the saccharin it purchased

from Mr. Huang, Univar received notice from a U.S. Producer—PMC Specialties Group,

Inc. ("PMC")—that it believed Mr. Huang was not producing saccharin, but importing

Chinese product and relabeling it.  PCSOF ¶ 205; Pl.'s Attach. 1 at Univar_066462.  Mr.

Biggs relayed PMC's beliefs to Mr. Chin in an email, and asked Mr. Chin if there was

"any proof that [Mr. Huang] can provide that [Univar] can use to kill this question."

PCSOF ¶ 205; Pl.'s Attach. 1 at Univar_066462.  In response, Mr. Chin stated that,

according to Mr. Huang, Mr. Biggs's visit to the factory in 2004 was "good proof."

PCSOF ¶ 206; Pl.'s Attach. 1 at Univar_011207.

A September 15, 2004 email indicates that Univar provided a sample of the

saccharin it purchased from Mr. Huang to PMC for testing.  PCSOF ¶ 209; Dep. Ex.

310; *see also* DSOF ¶ 158; Biggs. Dep. 150:3-23.  After conducting the lab tests, PMC

informed Mr. Biggs that it was "99.99 [percent] convinced" that the saccharin originated

in China, not Taiwan, due to the method used to produce it, which was the Maumee process.[27]  PCSOF ¶ 209; Dep. Ex. 310 at Univar_011211; *see also* Def.'s Resp. to PCSOF ¶ 209 ("Univar does not dispute that this is what PMC 'contended' in September 2004 . . . .").  PMC explained that it "very much doubt[ed]" that the Maumee process "exists anywhere else in the world except in the USA . . . and the PRC."  Dep. Ex. 310 at Univar_011211.  Mr. Biggs "distrusted PMC's claim" because Univar commonly encountered U.S.-based companies that had a "false" "understanding of what was going on in China."[28]  DSOF ¶ 98; PCSOF ¶ 98.

Also in September 2004, Robert Spear, of PepsiCo, Inc. ("Pepsi"), a Univar customer, wrote an email to Mr. Biggs inquiring: "The Taiwan plant doesn't make the base saccharin molecule does it?  I thought I heard the plant receives the base product from China."[29]  Dep. Ex. 317 at Univar_066447; PCSOF ¶ 208Def.'s Mem., Attach. 26

---

[27] There are two main processes for producing saccharin: the Remsen-Fahlberg process and the Maumee process.  Chyall Report ¶¶ 29-30; *id.* at 11-12 Figs.4 & 5.
[28] During fact discovery, the government confirmed that "the United States does not contend that the Maumee [p]rocess was not used to produce saccharin in Taiwan," and "[t]he process by which the saccharin [was produced] was not construed as a factor in the investigation once agents discovered that the Maumee process was not used exclusively in China."  DSOF ¶ 99; PCSOF ¶ 99.
[29] The following month, in October 2004, Mr. Biggs requested confirmation from Mr. Huang regarding the origin of the "original saccharin molecule" used in the production of acid saccharin.   PCSOF ¶ 210; Dep. Ex. 311.  Mr. Biggs advised that if the origin was China, Univar's imports would be subject to the antidumping duties. Dep. Ex. 311.  He went on to state: "[T]he 'best' answer is an answer from [Mr. Huang's] Japanese source that no raw materials originating from China were used in the production of the acid saccharin that it sells to [Mr. Huang.]"  *Id.*  Shortly thereafter, Mr. Huang informed Mr. Biggs the following:

> In some cases, we directly import 'saccharin acid,' and add other raw
> materials to manufacture the finished product (sodium saccharin).
> However, the imported quantity is very small. . . . [S]accharin acid[] is

(Decl. of Robert Spear) ("Spear Decl."), ECF No. 143-5 (expressing lack of recollection

regarding the email, but otherwise not disputing that he sent it);[30] *see also* Compl. ¶ 16;

Answer of Def. Univar USA Inc. to Pl.'s Compl. ("Answer") ¶ 16, ECF No. 8 (establishing

that Pepsi is a Univar customer).

On April 7, 2006, Mr. Biggs received an email from a Univar colleague that

relayed some information she heard during a meeting with one of Univar's customers.

Dep. Ex. 322; Biggs. Dep. 182:9-16.  She stated, "rumor has it that Mr. Biggs from

Univar has already been buying Chinese material.  Yes you were mentioned by name."

PCSOF ¶ 216; Dep. Ex. 322; Biggs Dep. 182:9-16, 183:6-12.  Mr. Biggs's reaction to

this email was to "chuckl[e]"; he believed "there was a history of bad-unreliable

information from this buyer."  Biggs Dep. 183:14-22.

In January 2007, an account executive at Univar sent an email to the company's

International Sourcing Group stating the following:

---

imported from two companies, Aisan Chemicals Ltd and Fuji Chemicals
Ltd. . . . Only in the case that the product quantity demanded by the
market is large, we will import a small quantity of . . . saccharin acid from
Japan and further process them (through chemical reaction) into the
finished products.

Def.'s Reply, Attach. 77 (Fax from Mr. Huang to Mr. Biggs) ("Huang Nov. 2004 Fax"),
ECF No. 161-3 (emphasis omitted); Def.'s Resp. to PCSOF ¶ 238.

[30] During fact discovery in this case, Mr. Spear recognized that his name is referenced
in the email communications with Univar in 2004, but he did not recall either sending or
receiving the email.  DSOF ¶ 104; PCSOF ¶ 104.  Further, he affirmed that he "do[es]
not recall ever informing Univar that an antidumping duty order covered imports of
Taiwanese saccharin manufactured in plants that received Chinese-origin components,"
and that he did not "recall ever informing Univar (or Mr. Biggs) that 'Mr. Huang received
subject saccharin base product from China.'"  DSOF ¶ 103; PCSOF ¶ 103.  Mr. Biggs
testified to his receipt of the email in question.  Biggs Dep. 170:7-171:17.

> I had one of my customers tell me that one of our competitors told her that we were getting product that is actually manufactured in China then shipped to Taiwan and then repackaged and marked as manufactured in Taiwan. She wanted me to look into this.  We just secured this business at this account so it may be just a competitor who is upset over losing the business.  Can you let me know about this. [sic]

PCSOF ¶ 217; Dep. Ex. 323 at Univar_012851.

John Lombard is the president of Lomco, Inc., a company that "assist[s] companies in managing inventories, by buy[ing] and sell[ing] some of their surplus and obsolescent chemicals and sell[ing] them into the secondary markets."  DSOF ¶¶ 107-108; PCSOF ¶¶ 107-108  (second and third alteration in original) (internal quotation marks omitted).  In or around October 2008, Lomco, Inc. attempted to sell Univar's saccharin and eventually identified PMC as a potential buyer of this material.  DSOF ¶ 109; PCSOF ¶ 109.  During the course of his  attemps to sell this saccharin to PMC, a PMC employee told Mr. Lombard "that there was no factory, no production [of saccharin] in Taiwan," although this employee did not elaborate why she believed there were no such manufacturers.[31]  DSOF ¶ 110; PCSOF ¶ 110.

In November 2008, Mr. Lombard informed Univar:

> Our major hurdle with assisting you is the following: Regardless of what they say, Lung Huang Trading are not manufacturers of Sodium Saccharin. They are buying material from mainland China and repackaging the material. As you probably know, several years ago dumping duites [sic] were implemented against Chinese producers of Sodium Saccharin. . . .  I can't imagine that Univar didn't dot all the I's [sic] and cross all the Ts before beginning to import Sodium Saccharin.

---

[31] Close to this time-frame, in a November 7, 2008 fax to Mr. Biggs, Mr. Huang stated that he "told [] the truth," and he "absolutely [had] not imported Chinese made saccharin acid. . . . please don't worry."  PCSOF ¶ 218; Dep. Ex. 325 (capitalization omitted).

PCOF ¶ 218; Dep. Ex. 259 at Univar_014646 (email from Mr. Lombard to Mr. Biggs),

ECF No. 154-4.  Mr. Lombard did not make those statements on personal knowledge,

but rather based on "information supplied by . . . PMC as well as information that [he]

could or could not find on the internet about manufacturing of [s]odium [s]accharin in

Taiwan."  DSOF ¶¶ 111, 113; PCSOF ¶¶ 111, 113.  As he recalled during his deposition

in this case, "[he] was seeking information on Taiwanese manufacturers of [s]odium

[s]accharin" on the internet and he didn't "believe [he] was able to find any."  DSOF

¶ 112; PCSOF ¶ 112 (alteration in original).

### D.  Customs' Investigation of Univar's Entries

On February 20, 2010, ICE informed Univar's Chief Executive Officer that the

company was under investigation for "possible transshipment of saccharin

manufactured in [China] in order to avoid payment/deposit of anti-dumping duties

associated with the commodity."  PCSOF ¶ 220; Dep. Ex. 12 at Univar_065600.[32]  At

the time it issued this letter, the Government "had suspicions transshipment was

occurring," but "[a]t that point[,] there was nothing confirmed."  DSOF ¶ 118; PCSOF

¶ 118.

In April 2010, two Government employees, chemist Yogendra Raval and Agent

Tsui, went to Taiwan.  DSOF ¶ 25; PCSOF ¶ 25.  They toured HTC's factory to

determine the type of manufacturing process that HTC was using to produce saccharin.

---

[32] After receipt of the ICE letter in February 2010, Univar continued importing saccharin purchased from Mr. Huang for more than two years.  PCSOF ¶ 220; DSCOF ¶ 220 (not objecting to this assertion).

DSOF ¶¶ 25, 26; PCSOF ¶ 25, 26; *see also* Tsui Aff. ¶ 10 ("The purpose of the visit to

HTC was to verify that HTC in fact manufactured the saccharin that it exported to the

United States.")  During this visit, Mr. Raval reviewed a "process flow chart," "[p]urchase

documents for raw materials," and "took a sample for [his] lab" to ensure that the

product was saccharin; he ultimately concluded that "saccharin [wa]s being

manufactured according to the Maumee process" at HTC.[33]  DSOF ¶ 27; PCSOF ¶ 27

(alteration in original).

Agent Tsui also testified that he saw raw materials, equipment, and employees at

the HTC facility during this visit.  DSOF ¶ 29; PCSOF ¶ 29.  He testified he smelled a

"sweet smell in the air," which the HTC officials described to be the saccharin smell, and

tasted sweetness on his tongue.  Def.'s Mem., Attach. 24 ("Tsui Dep.") 65:1-14, ECF

No. 143-5.  Based on the taste, HTC's statements to him, and the consistency of the

end product, which he witnessed to be a "white powdery substance," Agent Tsui

"believed it was saccharin" that was being produced at the [HTC] factory in Kaohsiung

City."  DSOF ¶ 30; PCSOF ¶ 30; Tsui Dep. 65:17-22, 66:5-9.  During this visit, the "plant

manager admitted" to Agent Tsui that HTC was "in violation of local fire and

environmental regulations" but that it was "still successfully producing saccharin."

DSOF ¶ 39; PCSOF ¶ 39.

---

[33] Mr. Raval documented his visit with photographs.  DSOF ¶ 28; PCSOF ¶ 28.  Univar's expert, Dr. Chyall, reviewed Mr. Raval's photographs, trip reports, and deposition testimony concerning his visit to the HTC plant in 2010, and, based on those sources, concluded that the HTC factory "is capable of producing acid saccharin and saccharin sodium."  DSOF ¶ 31; PCSOF ¶ 31.

On June 10, 2010, Agent Tsui determined that both LH Trading and LH Chemical were located at the following address: "Section 19, Lane 142, Wun Cih Road, Kaoshiung City, Taiwan." Tsui Aff. ¶¶ 13, 14.  A week later, on June 17, 2010, Agent Tsui conducted a site visit to this address and observed that the building located at this address was "a 12-story residential apartment building located in a dense residential neighborhood." *Id.* ¶ 15.  He "did not observe any manufacturing, industrial activity, or distribution at this location or its vicinity." *Id.* ¶ 16.  Agent Tsui provided photographs of "Google maps" images depicting "the site that [he] visited" on this date. *Id.*, Ex. 2 (referencing screenshots showing "Lane 142, WénCí Road, Zuoying District, Taiwan").

### E.  Taiwan's Economy and Regulation of Saccharin Production

"[I]n Taiwan, sodium saccharin is not a controlled item."  DSOF ¶ 33; PCSOF ¶ 33.  Taiwan requires a saccharin manufacturing license only if the sodium saccharin "is used [as a] food additive."  DSOF ¶ 33; PCSOF ¶ 33.  Single food additive production is regulated and managed by the Ministry of Health and Welfare.  Def.'s Mem., Attach. 31 (Jyh-Quan Pan Aff.) ("Pan Aff."), ECF No. 143-5; Def.'s Mem., Attach. 10 at US007941 (email from Lisa Yang to Eben Roberts), ECF No. 143-5.  Between 2004 and 2012, the Ministry of Health and Welfare did not issue any licenses for the manufacture of sodium saccharin.  DSOF ¶ 34; Pan Aff.

According to Professor Jane Winn, Univar's proposed expert witness, the term informal economy "refers to economic activities that take place outside of government regulation."  DSOF ¶ 37; PCSOF ¶ 37.  Professor Winn's "primary focus in [her] analysis is on activities that would otherwise be legitimate economic activities if they had been

undertaken in compliance with all relevant laws and regulations."  DSOF ¶ 37; PCSOF

¶ 37 (alteration in original).  According to Professor Winn, Taiwan's informal economy

"remain[s] significant" and "the facts associated with [HTC] are consistent with

companies in Taiwan that operate without a manufacturing license because they are

facts that suggest that a company is operating partly or wholly in the informal economy."

DSOF ¶ 38; PCSOF ¶ 38 (first alteration in original).

### F.  Administrative Proceedings

"In July 2014, CBP issued a pre-penalty notice to Univar," claiming a penalty of

approximately $47.9 million and lost duties of $36.1 million.  DSOF ¶ 165; PCSOF

¶ 165.  On July 29, 2014, Univar requested that CBP identify the material facts

supporting its pre-penalty notice.  DSOF ¶ 166; PCSOF ¶ 166.  In response, CBP

directed Univar to submit a Freedom of Information Act request to obtain the requested

information.  DSOF ¶ 167; PCSOF ¶ 167.  Univar complied with this directive "and

subsequently responded to the pre-penalty notice."  DSOF ¶ 168; PCSOF ¶ 168.

On October 1, 2014, CBP issued its penalty notice, which contained allegations

identical to the pre-penalty notice.  DSOF ¶¶ 169-170; PCSOF ¶¶ 169-170.  "On

October 31, 2014, Univar submitted a petition for relief."  DSOF ¶ 171; PCSOF ¶ 171.

In response, CBP's Office of International Trade – Regulations and Rulings ("CBP

Headquarters") "provided a 'partial decision' to Univar's petition for relief."  DSOF ¶ 172;

PCSOF ¶ 172.  In relevant part, this partial decision stated that the CBP Headquarters'

"review of the case file revealed that the penalty notice does not include the material

facts supporting CBP's allegation that the saccharin was of Chinese origin and

supporting a degree of culpability of gross negligence."  DSOF ¶ 173; PCSOF ¶ 173.

Thus, CBP Headquarters denied without prejudice Univar's petition for relief and

remanded the case back to the CBP office "to issue an amended penalty notice that

includes the material facts supporting CBP's allegation that the saccharin was of

Chinese origin and supporting a degree of culpability of gross negligence."  DSOF

¶ 174; PCSOF ¶ 174.  "On February 10, 2015, CBP issued a 'revised penalty notice' to

Univar."  DSOF ¶ 175; PCSOF ¶ 175.

## III. Procedural History

Plaintiff commenced this action on August 6, 2015.  *See* Summons, ECF No. 1;

Compl.  On October 6, 2015, Defendant filed an answer to the complaint.  Answer.

Defendant previously moved for partial summary judgment in its favor with

respect to 23 entries that occurred prior to March 2010.  Univar's Mot. for Partial Summ.

J., ECF No. 18.  Plaintiff cross-moved for partial summary judgment in its favor with

respect to 13 entries that occurred during or after March 2010.  Confidential Pl.'s Opp'n

to Univar's Mot. for Partial Summ. J. and Cross-Mot. for Partial Summ. J., ECF No. 30.

Both motions were filed while discovery was ongoing.  On December 22, 2016,

recognizing that there were material facts in dispute and each party was in the process

of conducting discovery on relevant issues, the court denied both motions and allowed

discovery to continue.  *United States v. Univar USA, Inc.*, 40 CIT ___, 195 F. Supp. 3d

1312, 1320-23 (2016).  The parties have completed discovery, and Univar now moves

for summary judgment in its favor with respect to all entries.

## DISCUSSION

### I.  Standard of Review

The Government brought this action against Defendant to recover unpaid duties

and a monetary penalty owing from allegedly transshipped saccharin from China

through Taiwan pursuant to 19 U.S.C. § 1592.  *See generally* Compl.  As such, the

court has jurisdiction to hear this action pursuant to 28 U.S.C. § 1582.

The Court of International Trade reviews all issues in actions brought for the

recovery of a monetary penalty pursuant to 19 U.S.C. § 1592 *de novo* and on the basis

of the record made before the court.  19 U.S.C. § 1592(e)(1); 28 U.S.C. § 2640(a); *see*

*also United States v. ITT Indus., Inc.*, 28 CIT 1028, 1035, 343 F. Supp. 2d 1322, 1329

(2004), *aff'd*, 168 F. App'x 942 (Fed. Cir. 2006).  Summary judgment is proper when

"the movant shows that there is no genuine issue as to any material fact and the movant

is entitled to judgment as a matter of law."  USCIT Rule 56(a); *see also Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 322-23 (1986).

The movant may discharge its burden of showing the absence of a genuine issue

of material fact by demonstrating that the nonmovant "fail[ed] to make a showing

sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial," or by pointing to "an absence of

evidence to support the nonmoving party's case." *Id.* at 322, 325; *see also Exigent*

*Tech. v. Atrana Solutions, Inc.*, 442 F.3d 1301, 1307-1308 (Fed. Cir. 2006) (discussing

*Celotex Corp.*).  The movant may do so by "identifying those portions of the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323 (internal quotation marks omitted); *see also* USCIT Rule 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by [] citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials[.]").

To defeat summary judgment once the moving party has met its burden, the nonmoving party must "'cit[e] to particular parts of materials in the record' to establish the 'presence of a genuine dispute' warranting trial." *Macclenny Prods. v. United States*, 38 CIT ___, ___, 963 F. Supp. 2d 1348, 1358 (2014) (alteration in original) (quoting USCIT Rule 56(c)). "'[I]f a party 'fails to properly address another party's assertion of fact,' that assertion of fact may be deemed 'undisputed for purposes of the motion.'" *Id.* (quoting USCIT Rule 56(e)(2)).  There must exist more than "a scintilla of evidence" to support the non-moving party's claims, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986); conclusory assertions will not suffice, *see* USCIT Rule 56(e).

The court must view the evidence in the light most favorable to the nonmovant and may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact.  *See Anderson*, 477 U.S. at 249, 255; *Netscape Comm.'s Corp. v. Konrad*, 295 F.3d 1315, 1319 (Fed. Cir. 2002).

## II. Legal Framework

In relevant part, § 1592 bars the grossly negligent or negligent entry, introduction, or attempt to enter or introduce, merchandise into the commerce of the United States by means of a material false statement or material omission.  19 U.S.C. § 1592(a)(1)(A). [34]

A statement is material when it has the "potential to alter Customs' appraisement or liability for duty." *United States v. Horizon Prod. Int'l Inc.,* 39 CIT __, __, 82 F. Supp. 3d 1350, 1356 (2015) (citation omitted); *see also United States v. Menard, Inc.*, 16 CIT 410, 417, 795 F. Supp. 1182, 1188 (1992) (materiality for purposes of § 1592 refers to the false statement's effect on CBP's determination of the applicable duty); 19 C.F.R. Pt. 171, App. B(B) (2013) (defining materiality for purposes of § 1592).

The statute does not define the term "false"; thus, it is defined according to its ordinary meaning.  *United States v. Rockwell Automation Inc.*, 30 CIT 1552, 1557 462 F. Supp. 2d 1243, 1248 (2006) (citing *Perrin v. United States*, 444 U.S. 37, 42 (1979)).

---

[34] In full, § 1592(a)(1) provides:
    (a) Prohibition
        (1) General rule
        Without regard to whether the United States is or may be deprived of all or a portion of any lawful duty, tax, or fee thereby, no person, by fraud, gross negligence, or negligence--
            (A) may enter, introduce, or attempt to enter or introduce any merchandise into the commerce of the United States by means of--
                (i) any document or electronically transmitted data or information, written or oral statement, or act which is material and false, or
                (ii) any omission which is material, or
            (B) may aid or abet any other person to violate subparagraph (A).
19 U.S.C. § 1592(a)(1).

According to Black's Law Dictionary, a statement is "false" when it is "untrue" or "[n]ot genuine; inauthentic." *Id.* (quoting Black's Law Dictionary 635 (8th ed. 2004)) (citing *Koyo Seiko Co. v. United States*, 36 F.3d 1565, 1571 n.9 (Fed. Cir. 1994) (dictionaries may supply the common meaning of a term)).

Violations of § 1592(a) may be punishable by a civil penalty depending on the degree of culpability.  19 U.S.C. § 1592(c).  "[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson*, 477 U.S. at 254.  "Parties must meet their burdens of proof regarding [culpability] by a preponderance of the evidence." *United States v. Matthews*, 31 CIT 2075, 2081, 533 F. Supp. 2d 1307, 1313 (2007) (citing *United States v. New–Form Mfg. Co., Ltd.*, 27 CIT 905, 918–19, 277 F. Supp. 2d 1313 (2003)); *cf. Anderson*, 477 U.S. at 252 (in determining whether summary judgment should issue, "[t]he judge's inquiry . . . unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [party bearing the burden of proof at trial] is entitled to a verdict").

A defendant's false statement or omission is negligent when it results from a "failure to exercise the degree of reasonable care and competence expected from a person in the same circumstances either: (a) in ascertaining the facts or in drawing inferences therefrom, in ascertaining the offender's obligations under the statute; or (b) in communicating information in a manner so that it may be understood by the

recipient." 19 C.F.R. Pt. 171, App. B(C)(1).[35]  Plaintiff bears the initial burden of proving

the act or omission constituting the violation; the burden then shifts to the alleged

violator to "affirmatively demonstrate that it exercised reasonable care under the

circumstances." *Ford Motor Co*., 463 F.3d at 1279 (Fed. Cir. 2006); 19 U.S.C.

§ 1592(e)(4).  To establish gross negligence, Plaintiff must prove "an act or acts (of

commission or omission) [by Defendant] done with actual knowledge of or wanton

disregard for the relevant facts and with indifference to or disregard for the offender's

obligations under the statute." 19 C.F.R. Pt. 171, App. B(C)(2); *see also Ford Motor

Co*., 463 F.3d at 1292 ("An importer is guilty of gross negligence if it behaved willfully,

wantonly, or with reckless disregard in its failure to ascertain both the relevant facts and

the statutory obligation, or acted with an utter lack of care.").  "[A] determination of gross

negligence involves a determination of intent"; thus, "it is an issue of fact, not law." *Ford

Motor Co*., 463 F.3d at 1292.

## III. Analysis

### A. Entry of Merchandise

Parties do not dispute that Univar, as the importer of record, made the subject

entries. *See* PSOF ¶¶ 181, 183; Defs.' Resp. to PSOF ¶¶ 181, 183.  Accordingly, there

is no dispute that Univar "enter[ed]" merchandise for purposes of § 1592(a).

---

[35] "As a general rule, a violation is negligent if it results from failure to exercise
reasonable care and competence . . . to ensure that statements made and information
provided in connection with the importation of merchandise are complete and accurate."
19 C.F.R. Pt. 171, App. B(C)(1).

### B. Material False Statement

Univar declared Taiwan as the country of origin for all entries of subject merchandise.  *See* DSOF ¶ 3; PCSOF ¶¶ 3, 183; Def.'s Resp. to PCSOF ¶ 183; Univar's Resp. to Pl.'s First Set of Disc. Req. at 16.  Plaintiff contends Univar misrepresented the country of origin as Taiwan because the country of origin was China.  DSOF ¶ 6; PCSOF ¶ 6; Pl.'s Opp'n at 1-2.

Univar argues it is entitled to summary judgment because the Government has not established a violation of 19 U.S.C. § 1592; particularly "there is an absence of evidence supporting the government's theory."  Def.'s Mem. at 23  (citation omitted) (internal quotation marks omitted); *see also* Def.'s Suppl. Mem. at 1.  The Government urges the court to deny Univar's motion because it contends there is "direct evidence" establishing that each entry originated in China and was transshipped through Taiwan, and thus, Univar made material false statements to CBP concerning the country of origin of the imported merchandise.  *See* Pl.'s Opp'n at 15-19.  According to the Government, the available evidence "compels rejecting Univar's motion for summary judgment and presenting this case to a jury."  *Id.* at 2.  Generally, the Government relies on the same collective evidence as proof of transshipment for all of the entries.  *See generally* Pl.'s Opp'n.  Because Univar makes separate arguments concerning its entries in 2007 and 2008 and those in 2009 through 2012, the court bifurcates its discussion accordingly.  *See* Def.'s Mem. at 24, 30; Def.'s Suppl. Mem. (addressing 2007-2008 entries).

### 1. The Presence of Disputed Facts Precludes Summary Judgment with Respect to the 2007 and 2008 Entries

With respect to the 2007 and 2008 entries, the Government relies on the expert report of Dr. McFarland that the "saccharin whose origin is at issue in this case was very likely produced in China."[36]  Pl.'s Opp'n at 15-16, 19; s*ee also id.* at 5-6 (discussing impossibility of Japanese origin).   The Government further asserts that the address of Mr. Huang's factory that Univar provided to the FDA was an apartment building in a residential neighborhood, not capable of producing saccharin.  *Id.* at 6.  Additionally, the Government contends that several pieces of circumstantial evidence further demonstrate that none of the entries could have originated in Taiwan, or any country other than China.  *Id.* at 19-22.  The circumstantial evidence includes:

> (1) Univar itself understood that Mr. Huang was a Chinese manufacturer; (2) neither LH Trading nor LH Chemical possesses any manufacturing capability or license; (3) there was only one possible (unlicensed) saccharin producer in Taiwan (HTC) at all relevant times; (4) HTC exported saccharin only to Rit-Chem, a Univar competitor; (5) HTC did no business with Mr. Huang during the relevant period; and (6) the only third-country from which Univar's saccharin could have originated was China.

Id. at 19.  Thus, the Government urges that the totality of circumstances would lead a rational trier of fact to find for the Government.  *Id.* at 22.

---

[36] Dr. McFarland reached this conclusion with respect to all 36 entries after considering Taiwanese import and export statistics, Japanese export statistics, U.S import statistics, the Taiwan Customs Tables, and other evidence from discovery.  *See* McFarland Report; Pl.'s Attach. 20 (Suppl. Report of Henry B. McFarland, Ph.D.) ("McFarland Suppl. Report"), ECF No. 154-3.  Univar's challenges to the factual foundation of Dr. McFarland's opinion concerning the 2007 and 2008 entries are addressed *infra*.

Univar counters that Dr. McFarland's testimony fails to create a genuine dispute of material fact concerning the 2007 and 2008 entries because his opinion lacks factual foundation and is based upon a faulty syllogism.  Def.'s Suppl. Mem. at 1-9.  Univar further asserts that the street name that Agent Tsui identified as having visited on June 17, 2010, "Wen Cih Road," differs from that depicted on the Google maps photograph, "WénCí Road," and the Government has not proved that these addresses identify the same location.  Def.'s Resp. to PCSOF ¶ 204; *see also* Def.'s Reply at 3-4.  Univar further maintains that the Government has failed to establish that Taiwan required a manufacturing license for saccharin being produced in Taiwan for food use in a foreign country.  Def.'s Mem. at 29; Def.'s Reply at 12.  Univar argues that HTC produced the sodium saccharin in Taiwan, sold it to Mr. Huang, who then exported it to Univar.  Def.'s Mem. at 4-5, 28; *see also* Def.'s Reply at 13-14.  Even if the Government were to establish that HTC did not have a license to produce saccharin, Taiwan's informal economy remains significant, and the facts associated with HTC "are consistent with companies in Taiwan" operating in the informal economy.  Def.'s Mem. at 30; DSOF ¶ 38; PCSOF ¶ 38.

Conflicting evidence concerning the origin of the 2007 and 2008 entries precludes entry of summary judgment in Univar's favor.  As a starting point, Univar reported to the FDA that the address of Univar's saccharin manufacturer was 19 Lane 142 Wen Chu Road 4FL Tso Ying Dist. Kaohsiung, Taiwan.  *See* Dep. Ex. 215 (Univar email discussing FDA registration); Chang Dep. 58:3-59:12.  The address that Rabbi Grunberg visited in March 2005 to inspect the plant of Univar's saccharin manufacturer

for purposes of certifying the plant as kosher was also located in "Tso Ying Dist,

Kaohsiung, Taiwan."  Rabbi Grunberg Inspection Report.  Agent Tsui observed that the

building located on "Wun Cih Road, Kaoshiung City, Taiwan" was a residential

apartment building; he "did not observe any manufacturing, industrial activity, or

distribution at this location or its vicinity."  Tsui Aff. ¶¶ 15, 16.  Although the spelling of

the street name varied, evidence suggests that the street name has been Romanized in

various ways.  *See* Tsui Dep. 114:9-116:10.

Next, Taiwan requires a saccharin manufacturing license if the sodium saccharin

is used as a food additive, DSOF ¶ 33; PCSOF ¶ 33, and in the years 2007 and 2008,

the Ministry of Health and Welfare did not issue any licenses for the manufacture of

sodium saccharin, DSOF ¶ 34; Pan Aff.  Univar promoted its saccharin as a food

additive, *see* Dep. Ex. 314 at Univar_065703, and saccharin was "an important food

product," for the company, Biggs Dep. at 43:20-44:4.  While Univar argues that the

Government has failed to establish that Taiwan required a manufacturing license when

saccharin was being produced in Taiwan for food use in a foreign country, the Director

of the Food and Safety Division of Taiwan's Food and Drug Administration that

submitted the affidavit concerning Taiwan's licensing requirements unconditionally

stated that "[s]ingle food additive production in Taiwan must be licensed."  Pan Aff.  To

the extent there is any ambiguity in this unconditional statement, "[w]hen ruling on a

motion for summary judgment, . . . all justifiable inferences are to be drawn in the

nonmovant's favor."  *Netscape Comm.'s*, 295 F.3d at 1319.

Further, relevant to the 2007 and 2008 entries, Dr. McFarland opined that: (1) "Taiwan had substantial saccharin imports from China and minimal saccharin imports from any other country;"[37] (2) "Taiwan had little or no domestic production of saccharin;" and (3) "by a process of elimination, the saccharin in question likely was in fact produced in China."   Suppl. DSOF ¶ 1; Suppl. PCSOF ¶ 1.

Univar challenges the factual foundation of Dr. McFarland's conclusion that Taiwan had little or no domestic production of saccharin.  Def.'s Suppl. Mem. at 4-5 (quoting *In re Nexium (Esomeprazole) Antitrust Litig.*, 42 F. Supp. 3d 231, 248 (D. Mass. 2014), *aff'd,* 842 F.3d 34 (1st Cir. 2016) ("[E]xpert testimony without . . . a factual foundation cannot defeat a motion for summary judgment.").  Univar argues that "no reasonable juror would give any weight" to Dr. McFarland's assessment of the evidence upon which he relied, or the conclusions that he reached.  Def.'s Suppl. Mem. at 3-9. Univar's challenges, however, are unpersuasive and go to the weight, rather than sufficiency of the evidence.  *See* Def.'s Suppl. Mem. at 4-8 (challenging Dr. McFarland's interpretation of certain evidence, for example, or inviting the court to consider possible bias behind witness statements that Dr. McFarland considered).  The court may not weigh the evidence or assess the credibility of witnesses at this summary judgment stage.[38]  *See Anderson*, 477 U.S. at 249, 255.  Dr. McFarland considered Taiwan's

---

[37] 97.8 percent of all of Taiwan's 2007 saccharin imports and 99.7 percent of all of its 2008 imports were from China.  McFarland Report at 4 Table 1.

[38] The court notes, however, that while Dr. McFarland articulated several reasons for his conclusion, two reasons provided were that "[a] document in evidence indicates there are [no saccharin producers in Taiwan]" and "the [U.S. International Trade Commission ("ITC")] was unable to identify a producer of saccharin in Taiwan."  Suppl. DSOF ¶ 2;

import and export statistics,[39] Taiwan's licensing requirements for the manufacture of

saccharin, the possibility of illegal saccharin production in Taiwan, and the possibility

that HTC produced the saccharin at issue.[40]  Suppl. DSOF ¶¶ 2, 3, 25; Suppl. PCSOF

¶¶ 2, 3, 25.  Thus, when viewing the collective evidence that Dr. McFarland considered,

the court cannot conclude that his opinion lacks factual foundation.

---

Suppl. PCSOF ¶ 2.  Univar asserts that the referenced document and the ITC report
concerned information related to production of saccharin in Taiwan in years other than
2007 and 2008.  Def.'s Suppl. Mem. at 4-5.  While Univar's complaints concerning those
individual sources informing Dr. McFarland's opinion are accurate in that the referenced
document pertained to Taiwanese production in 2010 and the ITC report pertained to
production in 2009 through 2014, Def.'s Suppl. Mem. at 4-5, Pl.'s Resp. to Def.'s Suppl.
Mem. at 5, Dr. McFarland's opinion was not founded exclusively on those sources.
[39] Taiwan's imports of saccharin were consistently greater than its exports: in 2007,
Taiwan imported 817,886 kilograms ("kg") of saccharin and exported 398,320 kg, while
in 2008, it imported 862,328 kg and exported 680,899 kg.  McFarland Report at 14
Table 6.  In both years, 99 percent of Taiwan's exports were to the United States.
McFarland Report at 15, Table 7.
[40] Dr. McFarland also considered the possibility that saccharin in the unfinished form
was imported from Japan into Taiwan and then converted to sodium saccharin in
Taiwan.  McFarland Report at 3; see also Pl.'s Opp'n at 5 (arguing that Mr. Huang's
representation to Mr. Biggs that he converted Japanese acid saccharin into sodium
saccharin in Taiwan was false) (citing Dep. Exs. 314, 315) (production process flow
chart listing Sei Cheng Chemical Co. (Japan) as the supplier of acid saccharin).  In his
opinion, Taiwanese import data "discredit[ed] that explanation" because Taiwan had
"[o]nly minimal amounts" of saccharin imports from Japan.  McFarland Report at 3
(explaining that 98.8 percent of Taiwanese imports "of all forms of saccharin" came from
China).  Univar argues that Dr. McFarland relied on a "faulty assumption" that Mr.
Huang claimed he imported all of his acid saccharin from Japan.  Def.'s Reply at 3.  It
contends that Mr. Huang's "reliance on Japanese suppliers for saccharin acid was 'very
small,'" and only "when 'product quantity demanded by the market [was] large.'"  Id.
(quoting Def.'s Resp. to PCSOF ¶ 203).  However, although Mr. Huang claimed in
November 4, 2004 that he imports only "very small" quantities of acid saccharin from
Japan that he later converts to sodium saccharin in Taiwan, his purported suppliers
listed in that fax were Aisan Chemicals Ltd. and Fuji Chemicals Ltd.  Huang Nov. 2004
Fax; see also Def.'s Resp. to PCSOF ¶ 203.  This claim was contradicted by his claim in
the production process flow chart, listing Sei Cheng Chemical Co. as his supplier, which
was adopted by Univar in its kosher certification application.  See Dep. Exs. 314, 315.

There is evidence that one saccharin producer, HTC, was producing saccharin in Taiwan, albeit without a license, for its use as a food additive.  Mr. Ritell visited the HTC plant in 2004 to observe the plant's manufacturing process.  DSOF ¶¶ 20, 21; PCSOF ¶¶ 20, 21.  During this visit, which lasted an entire day, Mr. Ritell witnessed "a chemical reaction in the kettles," "saw some packaging going on," "saw the raw material warehouse," and saw the then-current stock of product.  DSOF ¶ 22; PCSOF ¶ 22. According to Mr. Ritell, he had previously visited saccharin plants, and he had "[n]o doubt" that "it was an actual saccharin[] factory" that he visited.  DSOF ¶ 23; PCSOF ¶ 23; Ritell Dep. at 29:10-12.  Mr. Ritell visited the HTC plant again in "2008 or 2009" for a "yearly meeting" that lasted "[h]alf a day," and did not "notice anything different about the [saccharin] production facility" during that visit.  DSOF ¶¶ 20, 24; PCSOF ¶¶ 20, 24 (alterations in original); Ritell Dep. at 30:12.  Additionally, as stated previously, two government employees, Mr. Raval and Agent Tsui, who toured the HTC factory in 2010, concluded that saccharin was being manufactured at HTC.  DSOF ¶¶ 27, 29; PCSOF ¶ 27, 29.  During this visit, the "plant manager admitted" to Agent Tsui that HTC was "in violation of local fire and environmental regulations" but that it was "still successfully producing saccharin."  DSOF ¶ 39; PCSOF ¶ 39.  "[T]he facts associated with [HTC] are consistent with companies in Taiwan that operate without a manufacturing license because they are facts that suggest that a company is operating partly or wholly in the informal economy."  DSOF ¶ 38; PCSOF ¶ 38.

Although HTC was producing some saccharin in Taiwan during the relevant time period, there is conflicting evidence on whether HTC produced the saccharin that Univar

imported.[41]  Mr. Ritell, whose company was a customer of HTC, testified as to his

personal knowledge of HTC's annual production of saccharin, and the degree to which

Rit-Chem and HTC's other customer were responsible for that production amount.

Specifically, Mr. Ritell testified that HTC's annual production capacity was "300 to 500

tons per year."  Ritell Dep. 72:6-11.  HTC's largest customer "was a Taiwan electric

plating industry," and Rit-Chem purchased HTC's "excess volume," which peaked at

"220 tons."  *Id.* 72:12-16, 73:3-7; *see also* Dep. Ex. 297 (Univar's European affiliate's

2007 inspection of HTC's factory, noting that in 2007 HTC "was only producing" 100

metric tons of saccharin per year and that its main purpose was to produce for the

Taiwanese market).

Univar contends that to the extent the court considers exhibit 297, "the evidence

establishes that HTC did sell its saccharin within the domestic market – to Mr. William

Huang."  Def.'s Resp. to PCSOF ¶ 202; Def.'s Reply at 13-14.  Univar relies on Mr.

Huang's responses to the court's letter rogatory as proof.  Mr. Huang testified before a

---

[41] The evidence also is unclear as to whether Univar itself considered LH Trading as its "Chinese" saccharin supplier.  *See* PCSOF ¶ 239; Def's Resp. to PCSOF ¶ 239. Plaintiff relies on an email from a Univar employee to Mr. Biggs that contains as an attachment "a letter [that was] composed by Legal."  Pl.'s Opp'n at 19; Dep. Ex. 277. The letter, which was composed on June 1, 2007, states: "Recently, there have been requests for documentation on the use of melamine in Chinese food ingredients. In response, Univar has requested and received documentation from Chinese suppliers that suggests that the following FDA regulated products listed below do not contain Melamine."  Dep. Ex. 277 at Univar_012958.  The letter lists sodium saccharin as a product produced by LH Trading.  *Id.*  Univar correctly asserts that this exhibit "does not indicate if this alleged list of 'Chinese suppliers' encompasses suppliers from the People's Republic of China, Republic of China ('Taiwan') or both."  Def's Resp. to PCSOF ¶ 239.

district court in Taiwan that "[t]he country of origin of the saccharin sold by [LH Trading]

to Univar was indeed Taiwan" and the saccharin was manufactured at a "plant located

on Qinan Road." Def.'s Mem., Attach. 30 (Certified Translation of Confidential Letter

Rogatory Resp. of Mr. Huang) ("Huang Letter Rogatory") at 7, ECF No. 143-5. The

plant that Mr. Biggs toured in 2004 was the plant located on Qinan Road. DSOF ¶ 17;

PCSOF ¶ 17; PCSOF ¶ 190; Def.'s Resp. to PCSOF ¶ 190. However, despite the

uncontroverted fact that the only plant located on Qinan Road was owned by HTC,

DSOF ¶ 17; PCSOF ¶ 17, Mr. Huang also testified in the same proceeding that that he

did not have a business relationship with HTC:

> Judge: Are you familiar with the company known as 'High Trans
> Corporation'?
>
> Witness: I don't know this company.
>
> Judge: When I use the term 'HTC,' I am referring to 'High Trans
> Corporation.' Do you understand that?
>
> Witness: I am not familiar with this company.
>
> Judge: HTC once had a contract with Lung Huang Trading, is that
> correct?
>
> Witness: No, it didn't have a contract with Lung Huang Trading.

Huang Letter Rogatory at 14. Univar attributes Mr. Huang's latter testimony to a

translation issue, and asserts that HTC operated under different names, which may

have been the cause of confusion in Mr. Huang's testimony. *See* Def.'s Resp. to

PCSOF ¶ 202; Def.'s Reply at 2, 14. Univar's assertion is undermined by the fact that

during another portion of Mr. Huang's testimony, he indicated he knew of HTC:

> Judge: Between July 2007 and 2012, did HTC own the saccharin plant that you showed to Thomas Biggs of Univar, in 2004?
>
> Witness: No, HTC was a new company at the time, and I didn't buy saccharin from it.

Huang Letter Rogatory 30 at 4-5.

In sum, conflicting evidence concerning the origin of the 2007 and 2008 entries precludes entry of summary judgment in Univar's favor.  The court may not weigh the evidence, assess the credibility of witnesses, or resolve issues of fact.  *See Anderson*, 477 U.S. at 249, 255; *Netscape Comm.'s*, 295 F.3d at 1319.  Because the court must weight evidence in favor of the non-movant, Univar's motion with respect to those entries will be denied.  As to these entries, the Government has proffered enough evidence supporting its case such that "a fair-minded jury could return a verdict for the plaintiff on the evidence presented."  *Anderson*, 477 U.S. at 252.  For that reason, Univar's motion for summary judgment with respect to these entries will be denied.

### 2. The Presence of Disputed Facts Precludes Summary Judgment with Respect to the 2009-2012 Entries

In addition to the above evidence relating to the 2007 to 2008 entries, the Government relies on the Taiwan Customs Tables as "tantamount to DNA evidence" of Univar's wrongdoing.  Pl.'s Opp'n at 3.  One table purports to show 20 shipments of saccharin imported into Taiwan from China by LH Chemical from 2009 to 2011, and a second table purports to show 16 shipments of saccharin exported from Taiwan to the United States by LH Trading from 2009 to 2012.  *See* Taiwan Customs Tables.  The Government alleges that Mr. Huang imported the saccharin from China into Taiwan

through LH Chemical, and exported same to the United States through LH Trading.

Pl.'s Opp'n at 4-5.

Among the information included in the import table is that related to the "date of

import declaration," "Taiwanese buyer," "commodity description" (i.e., mesh sizes),

"quantity," and "weight." *See* Taiwan Customs Tables at ECF p. 5. Likewise, the export

table includes information for "date of export declaration," U.S. buyer, "Taiwanese

exporter," "commodity description," "quantity," and "weight." *Id.* at ECF p. 6. The

Government contends that the 16 entries into the United States from 2009 to 2012

"'correspond' to shipments of saccharin from China to Taiwan." DSOF ¶ 52; PCSOF

¶ 52. There is, however, conflicting evidence on whether these entries truly

"correspond."

First, the parties dispute whether Mr. Huang was the president of both LH

Chemical and LH Trading. *See* PCSOF ¶ 186; Def.'s Resp. to PCSOF ¶ 186. In

response to the letter rogatory, Mr. Huang testified that LH Chemical and LH Trading

are not the same companies and he has "nothing to do with LH Chemical." Huang

Letter Rogatory at 2-3, 7. However, several of Univar's internal documents and

documents presented to the FDA and the Orthodox Union indicate that Mr. Huang was

the president of LH Chemical or that LH Chemical was the manufacturer of the

saccharin that Univar purchased from Mr. Huang. *See, e.g.*, Dep. Exs. 214, 215, 314;

*see also* Chang Dep. 58:19-59:9 (identifying LH Trading as the supplier of Univar's

saccharin, and LH Chemical as the manufacturer); DSOF ¶ 124 (citing Biggs. Dep.

115:25-116:13) (where Mr. Biggs identified "Long Hwang Chemical" as "William Huang's saccharin plant").

In addition, the parties disagree on whether the "mesh sizes" in the tables correspond to the actual sizes shipped.  *See* DSOF ¶¶ 70-71, 76-79; PCSOF ¶ ¶¶ 70-71, 76-79.  While the Taiwan Customs Tables show some differences in mesh sizes between imports and exports, such differences may be explained by nothing more than inaccuracies, as demonstrated by evidence of customer complaints to Univar about receiving mislabeled saccharin.  *See* PCSOF ¶ 231; Biggs Dep. 213:5-23; Dep. Ex. 165.

In sum, the court's inquiry is to determine whether "there are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  *Anderson*, 477 U.S. at 250.  Based on the evidence presented, the court finds that whether Univar misrepresented the country of origin with respect to the 2009-2012 entries is an issue requiring submission to the jury.

### C. Culpability

#### 1. Univar Has Not Established that it Acted with Reasonable Care

As discussed above, pursuant to the statutory negligence provision of § 1592, Customs has the burden to show that a materially false statement or omission occurred in order to shift to the Defendant the burden to establish affirmatively that it "exercised reasonable care under the circumstances."  *Ford Motor Co*., 463 F.3d at 1279; 19

U.S.C. § 1592(e)(4).  Univar has not established that it acted with reasonable care under the circumstances.

There is no genuine dispute that after Commerce issued the antidumping duty order, Mr. Biggs consulted the World Wide Directory of Chemical Producers to search for non-Chinese manufacturers [of saccharin].  DSOF ¶ 139; PCSOF ¶ 139; Def.'s Mem. at 18.  As of October 2003, Univar had located Mr. Huang, DSOF ¶ 140; PCSOF ¶ 140; *see also* PCSOF ¶ 191; Dep. Ex. 288 at UNIVAR_013664-013665, and began the process of approving LH Trading/LH Chemical as a supplier, PCSOF ¶ 195; Dep. Ex. 179.  Univar registered these companies with the FDA and provided the physical address of these companies to the federal agency.  *See* Dep. Ex. 215; Chang Dep. 58:3-59:12.  When Mr. Biggs subsequently visited Mr. Huang in April 2004, to "inspect[]" the "new supplier," the factory he toured was located at an address different than that provided to the FDA.  *See* DSFO ¶ 124; PCSOF ¶¶ 124, 185, 189-90; Def.'s Resp. to PCSOF ¶¶ 185, 189-90.  Mr. Huang informed Mr. Biggs that he owned the factory that Mr. Biggs toured, PCSOF ¶ 187; Def.'s Resp. to PCSOF ¶ 187; however, the factory was owned by HTC, PCSOF ¶ 190; Def.'s Resp. to PCSOF ¶ 190.

Shortly after Univar began importing the saccharin it purchased from Mr. Huang, Univar received notice from a U.S. producer, PMC, that it believed Mr. Huang was not producing saccharin, but importing Chinese product and relabeling it.  PCSOF ¶ 205; Pl.'s Attach. 1 at Univar_066462.  Univar requested from Mr. Huang "any proof . . . to kill this question."  PCSOF ¶ 205; Pl.'s Attach. 1 at Univar_066462.  Mr. Huang's

response suggested that Mr. Biggs's visit to the factory in 2004 was "good proof."

PCSOF ¶ 206; Pl.'s Attach. 1 at Univar_011207.

Sometime in late 2004, Univar provided a sample of the saccharin it purchased

from Mr. Huang to PMC for testing.  PCSOF ¶ 209; Dep. Ex. 310; *see also* DSOF ¶ 158

(citing Biggs. Dep. 150:3-5).  After conducting the lab tests, PMC informed Univar that it

was "99.99 [percent] convinced" that the saccharin originated in China, not Taiwan.

PCSOF ¶ 209; Dep. Ex. 310 at Univar_011211. There is no evidence that Univar took

any affirmative steps to investigate this claim.  *Cf.* DSOF ¶ 98; PCSOF ¶ 98 (Mr. Biggs

"distrusted PMC's claim" because Univar commonly encountered U.S.-based

companies that had a "false" "understanding of what was going on in China").

In September 2004, Pepsi, a Univar customer, asked Univar whether Mr.

Huang's factory was purchasing "the base product from China."  PCSOF ¶ 208; Dep.

Ex. 317 at Univar_066447; *see also* Compl. ¶ 16; Answer ¶ 16 (establishing that Pepsi

is a Univar customer).  The following month, Univar requested confirmation from Mr.

Huang regarding the origin of the "original saccharin molecule" used in the production of

acid saccharin.    PCSOF ¶ 210; Dep. Ex. 311.  This communication from Univar to Mr.

Huang (through Mr. Chin) suggested what the "the 'best' answer" should be: "that no

raw materials originating from China were used in the production of the acid saccharin."

Dep. Ex. 311.  Mr. Huang's response on the following month, November 2004, indicated

that Mr. Huang sourced his acid saccharin from two Japanese producers.  Huang Nov.

2004 Fax.  "Univar knew it had an affirmative duty to ensure the source of its imports,"

DSOF ¶ 157; PCSOF ¶ 157; however, it never contacted any of Mr. Huang's purported

suppliers to verify the accuracy of Mr. Huang's statements, PCSOF ¶ 214; Def.'s Resp.

to PCSOF ¶ 214.

In April 2006, Mr. Biggs received yet another communication from a Univar

colleague informing him that it was "mentioned via a competitor that rumor has it that . .

. Univar has already been buying Chinese material." PCSOF ¶ 216; Dep. Ex. 322;

Biggs Dep. 182:9-1:16, 183:6-12. Mr. Biggs did not take any steps to investigate this

claim. *Cf.* Biggs Dep. 183:14-22 (his reaction to this email was to "chuckl[e]"; he

believed "there was a history of bad-unreliable information from this buyer"). The

following year, Univar received a similar notice. See PCSOF ¶ 217; Dep. Ex. 323 at

Univar_012851 (January 2007 notice from customer that heard Univar was purchasing

"product that is actually manufactured in China then shipped to Taiwan and then

repackaged and marked as manufactured in Taiwan").

In November 2008, Mr. Lombard, who owned a company that was assisting

Univar in selling excess saccharin inventory, warned Univar that the Taiwan saccharin

was in fact Chinese product. *See* PCOF ¶ 218; Dep. Ex. 259 at Univar_014646. Mr.

Lombard made those statements on "information supplied by . . . PMC as well as

information that [he] could or could not find on the internet about manufacturing of

[s]odium [s]accharin in Taiwan." DSOF ¶¶ 111-13; PCSOF ¶¶ 111-13 (alteration in

original). It appears that Univar continued to rely on Mr. Huang's assertions without

conducting further inquiry. *See* PCSOF ¶ 218; Dep. Ex. 325 (fax from Mr. Huang to Mr.

Biggs stating: "we told you the truth," and "we absolutely have not imported Chinese

made saccharin acid . . . please don't worry") (capitalization omitted).

Around this time frame, Rabbi Talmid from the Orthodox Union flew to Taiwan

three times to inspect the saccharin factory so that the Orthodox Union could continue

to certify it as kosher.  *See* Talmid Dep. 53:1-68:13; Biggs Dep. 218:6-9, 219:12-220:4.

Univar was aware that between 2007 and 2012, the Orthodox Union was unable to

inspect Mr. Huang's factory.  Biggs Dep. 218:6-9, 219:12-220:4.  Mr. Biggs testified that

he was aware the Orthodox Union "was having trouble gaining access to Mr. Huang's

facility in Taiwan" and "[did not] recall [the Orthodox Union] reporting other incidents like

that."  Biggs Dep. at 220:3-4.

On February 2, 2010, ICE informed Univar that the company was under

investigation for "possible transshipment of saccharin manufactured in [China] in order

to avoid payment/deposit of anti-dumping duties associated with the commodity."

PCSOF ¶ 220; Dep. Ex. 12 at Univar_065600.  Nonetheless, after receipt of the ICE

letter, Univar continued importing saccharin purchased from Mr. Huang for more than

two years.  PCSOF ¶ 220; DSCOF ¶ 220.  Even in light of the repeated rumors and

warnings it received and the Orthodox Union's inability to access the plant, Univar did

not seek to visit Mr. Huang's purported factory until 2012, after the company learned of

the investigation involving the entries at issue.  PCSOF ¶ 223; Def.'s Resp. to PCSOF

¶ 223; *see also* DSOF ¶ 151; PCSOF ¶ 151.

Univar relies on its receipt of a certificate of origin from the Kaohsiung Yuan City

Chamber of Commerce for each of the 36 entries as demonstrating that it exercised

reasonable care.  However, the Kaohsiung Yuan City Chamber of Commerce issues the

certificates of origin as "a routine business activity," DSOF ¶ 132; PCSOF ¶ 132, upon

receipt of an application by an exporter and "on the basis that the customs declaration information is verified to be correct," Chamber of Commerce Test. ¶ 4.  There is no indication that the Kaohsiung Yuan City Chamber of Commerce independently scrutinizes exporters' facilities.

Univar also relies on its receipt of kosher certifications from 2005 to 2012 by the Orthodox Union as demonstrating that it acted with reasonable care.  Def.'s Mem. at 38, 40.  While the Orthodox Union testified in this proceeding that it "take[s] its certification process seriously" and would "[n]ot knowingly . . . certify a product as kosher if the requirements of Jewish religious law are not met," DSOF ¶ 116; PCSOF ¶ 116 (alteration in original), it also continuously certified Mr. Huang's plant as kosher despite an inability to inspect the factory on at least three occasions, *see* Talmid Dep. 53:1-68:13; Biggs Dep. 218:6-9, 219:12-220:4; DSOF ¶ 145; PCSOF ¶ 145.  In order to re-certify a product as kosher, the Orthodox Union requires annual inspection of the production facility.  Talmid Dep. 60:9-15; *see also id.* 58:21-59:1.

Univar further points to the facts that it provided PMC a sample of its saccharin for lab testing and later participated in a "mock audit," which concluded that Univar is a "good importer" with a culture of compliance.  Def.'s Mem. at 38-39.  However, Univar appears to have taken no action when PMC suggested that its lab results indicated the saccharin was of Chinese origin, and it is unclear to what extent Univar's saccharin practices were the focus of the mock audit.

Univar asserts that Mr. Biggs's conclusion in 2004 that the factory he toured produced saccharin aligns with that of Univar's chemistry expert, Dr. Chyall, who

reviewed Mr. Biggs's factory tour photos and determined that "the chemical factory visited by Mr. Biggs in 2004 is capable of producing saccharin sodium and acid saccharin."  *Id.* at 37 (quoting DSOF ¶ 125).  While that may be true, in light of the foregoing discussion, Univar's failure to revisit its 2004 conclusion that its saccharin was coming from Taiwan could be found to be a failure to exercise reasonable care by the jury.[42]

### 2. Whether the Government Can Establish Univar Acted with Gross Negligence is a Triable Issue

As previously discussed, establishing gross negligence requires Plaintiff to prove that Univar acted "with actual knowledge of or wanton disregard for the relevant facts and with indifference to or disregard for the offender's obligations under the statute."  19 C.F.R. Pt. 171, App. B(C)(2); *see also Ford Motor Co.*, 463 F.3d at 1292 ("An importer is guilty of gross negligence if it behaved willfully, wantonly, or with reckless disregard in its failure to ascertain both the relevant facts and the statutory obligation, or acted with an utter lack of care.").

---

[42] Evidence indicates that Univar's actions may have been motivated by a financial incentive.  In 2008, the market experienced a shortage of sodium saccharin.  Biggs Dep. 198:1-5; *see also* PCSOF ¶ 241; Def.'s Resp. to PCSOF ¶ 241.  In April 2008, Univar expressed that "the shortage has obviously been good for Univar."  PCSOF ¶ 242; Dep. Ex. 328 at Univar 068865; *see also* PCSOF ¶ 245; Dep. Ex. 306 at Univar_006796 ("Due to the very rapidly increasing pricing, this volume now translates for Univar to a $30 million/[year] business!"), Univar_006794 (establishing date of document).  By the end of 2008, the price of saccharin had dropped, although it is unclear at what rate.  *See* Def's Resp. to PCSOF ¶¶ 241-43; Def.'s Reply, Attach. 71 (David Hansen Dep.) 40:7-41:21, 43:8-44:11, ECF No. 161-3.

The undisputed facts establish that "Univar knew that it had an affirmative duty to ensure the source of its imports."  DSOF ¶ 157; PCSOF ¶ 157.  Because of this uncontroverted fact, Univar asserts that the Government is unable to establish that Univar failed to ascertain its "statutory obligations" with regard to the antidumping duty order or reporting the proper country of origin.  Def.'s Mem. at 41-42 (emphasis omitted) (citation omitted).  However, Plaintiff has presented sufficient evidence in the form of Univar's limited follow-up on questions about the origin of its saccharin after Mr. Biggs's 2004 visit to HTC's plant, which could lead a reasonable jury to find by a preponderance of the evidence that Univar was indifferent to or disregarded its statutory obligations, and therefore acted with gross negligence.  *See supra* Discussion III.C.1; 19 C.F.R. Pt. 171, App. B(C)(2); *Ford Motor Co.*, 463 F.3d at 1292.

## IV. Alleged Procedural Violations

Univar argues that the Government's penalty claims should be dismissed for failure to comply with the statutory obligations pursuant to § 1592(b)(2).  Def.'s Mem. at 42-44.  Univar asserts that the Government failed to meet the requirements of §1592(b)(2) when, after reviewing Univar's petition for mitigation, it determined, that "'the penalty notice does not include the material facts supporting CBP's allegation[s]' of Chinese origin and gross negligence."  *Id.* at 43 (alteration in original) (quoting DSOF ¶¶ 171-73).  According to Univar, at that point, CBP should have issued a decision setting "forth the final determination," rather than remanding the case to CBP headquarters.  *Id.*  (emphasis omitted) (citing *United States v. Tip Top Pants, Inc.*, 34 CIT 1020, 1027 (2010)).  The Government contends that the obligation to end the

§ 1592 proceeding was not triggered when CBP reached the partial decision, and Univar points to no evidence "that CBP had concluded that there was no violation."  Pl.'s Opp'n at 27-28.

If, after issuance of the pre-penalty notice and consideration of any representations by the person concerned, "the Customs Service determines that there was a violation [of 19 U.S.C. § 1592(a)], it shall issue a written penalty claim to such person."  19 U.S.C. § 1592(b)(2).  Thereafter, the interested person may file a petition to mitigate the penalty.  *See* 19 U.S.C. § 1618 (CBP "may remit or mitigate the [penalty] upon such terms and conditions as he deems reasonable and just").  "At the conclusion of any proceeding under [19 U.S.C. § 1618], the Customs Service shall provide to the person concerned a written statement which sets forth the final determination and the findings of fact and conclusions of law on which such determination is based." 19 U.S.C § 1592(b)(2).  Customs regulations further provide that, "[i]f a petition for relief relates to a violation of section[] 592 . . .,  the petitioner will be provided with a written statement setting forth the decision on the matter and the findings of fact and conclusions of law upon which the decision is based."  19 C.F.R. § 171.21.

"On October 1, 2014, CBP issued its penalty notice."  DSOF ¶ 169; PCSOF ¶ 169.  On October 31, 2014, Univar submitted its petition for relief, DSOF ¶ 171; PCSOF ¶ 171, pursuant to 19 U.S.C. § 1618.   CBP Headquarters reviewed Univar's petition for relief and "provided a 'partial decision,'" asserting that "the penalty notice [did] not include the material facts supporting CBP's allegation that the saccharin was of Chinese origin and supporting a degree of culpability of gross negligence."  DSOF

¶¶ 172, 173; PCSOF ¶¶ 172, 173.  Thus, CBP Headquarters denied without prejudice

Univar's petition for relief and remanded the case back to the CBP office "to issue an

amended penalty notice that includes the material facts supporting CBP's allegation that

the saccharin was of Chinese origin and supporting a degree of culpability of gross

negligence."  DSOF ¶ 174; PCSOF ¶ 174.

        CBP's partial denial of Univar's petition did not conclude the proceeding under 19

U.S.C. § 1618.  *See* 19 U.S.C. § 1618 (noting CBP's option to "order discontinuance of

any prosecution relating" to a fine or penalty incurred "without willful negligence . . .  or

intention . . . to defraud the revenue or to violate the law," or in circumstances when

CBP "finds the existence of such mitigating circumstances as to justify the remission or

mitigation of [the penalty]").  Instead, CBP Headquarters requested an amended penalty

notice containing the factual information "supporting CBP's allegation that the saccharin

was of Chinese origin and supporting a degree of culpability of gross negligence."

DSOF ¶ 174; PCSOF ¶ 174.  On February 10, 2015, CBP issued an amended penalty

notice to Univar.  DSOF ¶ 175; PCSOF ¶ 175.

        Defendant's reliance on *Tip Top* is inapposite.  *Tip Top's* holding is dependent on

Customs, in that case, having conceded that its allegation in the penalty notice was not

a violation of section 1592.  *Tip Top,* 34 CIT at 1027.  The *Tip Top* court reasoned, "[a]t

that point, [CBP] was required to set forth the decision on the matter, . . . including in

particular the negative conclusion of law it had reached, in the written statement

required by [19 U.S.C. § 1592(b)(2)], thus bringing to an end the proceeding under such

[§] 1618 to which [19 U.S.C. § 1592(b)(2)] refers." *Id.* at 1027 (citations omitted) (internal quotation marks omitted).

CBP made no such non-violation determination in this case.  Instead, it issued a partial decision denying, without prejudice, Univar's petition for relief and remanded the case to CBP with instructions to issue an amended penalty notice that includes the material facts supporting the allegations.  CBP maintained that Univar violated § 1592 throughout and provided additional material facts to support that conclusion.  *Cf.* 19 U.S.C. § 1592(b)(2) ("If the Customs Service determines that there was a violation, it shall issue a written penalty claim to such person.")  Accordingly, Univar's claims of procedural violations by CBP are without merit.

### CONCLUSION AND ORDER

For the foregoing reasons, Univar's motion for summary judgment will be denied. Accordingly, it is hereby

**ORDERED** that Defendant Univar USA Inc.'s motion for summary judgment (ECF No. 143) is **DENIED**; it is further

**ORDERED** that no later than November 28, 2018, the parties shall file, via CM/ECF, a proposed Pretrial Order, substantially in the form of Standard Chambers Form 1–1 (SCP 1–1), including all Schedules provided for therein.

/s/     Mark A. Barnett
Mark A. Barnett, Judge

Dated:   November 13, 2018
New York, New York